BROWN, C.J.
I Roth parties in this tort action have appealed from the trial court’s judgment entered in accordance with a jury verdict awarding plaintiff $20 million in damages for “destruction of business” and “loss of future profits.” For the reasons set forth *1021 below, we reverse and render judgment in favor of defendants.
BRIEF PROCEDURAL HISTORY
Jeff Mercer is the sole member and manager of Jeff Mercer, LLC.[1] Mercer was qualified as a Disadvantaged Business Enterprise (“DBE”) under a program established and administered by the Louisiana Department of Transportation and Development (“DOTD”) in accordance with United States Department of Transportation (“USDOT”) and Federal Highway Administration (“FHWA”) regulations. In February 2007, Mercer was hired as a subcontractor by Diamond B, the prime contractor on the DOTD Louisville Avenue Project in Monroe, Louisiana. Mercer’s work included the removal of concrete, adjustment of manholes and catch basins, and rebuilding of curbs and any affected sidewalk portions. In a petition filed on September 5, 2007, plaintiff, Jeff Mercer, LLC, named DOTD and several employees as defendants,[2] and alleged that a DOTD inspector on the Louisville Avenue project had attempted to solicit bribes from Mercer during the project. According to Mercer, he rebuffed the inspector and reported him to DOTD officials.
| ^Mercer alleged that after the report was made, DOTD and the named defendants retaliated against the LLC as a DBE. According to Mercer, as a result of this retaliation and discrimination, his business was injured, including “its business reputation, business profits and business relationships,” especially with Diamond B, the prime contractor on the project.
In a supplemental petition filed five years after the initial pleading, Mercer added more individual defendants[3] and alleged that DOTD’s retaliatory and discriminatory actions against him continued on projects after the Louisville Avenue project. According to plaintiff, on these subsequent jobs, DOTD, through its employees, made the work difficult and costly. Mercer also asserted for the first time claims of fraud and unfair trade practices. In a second supplemental petition, Mercer added claims that defendants conspired together to put him out of business, and noted that on September 28, 2012, Mercer filed an action against prime contractor Austin Bridge & Road, LP, several of its sureties, and DOTD in East Baton Rouge Parish, seeking over $9 million in contractual damages arising out of one of these subsequent projects.
Defendants filed a motion for summary judgment on July 13, 2015, seeking dismissal of.plaintiffs claims, which they argued were contractual, not based in .tort, and unsupported by any relevant evidence from which plaintiff could, establish-a viable tort claim against defendants. This motion was denied by the trial court shortly before the trial began, which was on laNovember 9, 2015. Following the presentation of Mercer’s witnesses, defendants moved for directed verdict, asserting that: (1) plaintiff had failed to establish a cause of action under the Louisiana Unfair Trade Practices Act (“LUTPA”); and (2) plaintiff had failed to establish a cause of action for *1022 intentional interference with a contract because there was no contractual privity between defendants and plaintiff.
Initially, the trial court only granted directed verdict as to plaintiffs LUTPA claim. After closing arguments, however, the trial court reconsidered its ruling and granted directed verdict as to plaintiffs intentional interference with contract claim. Along with this ruling, the trial judge noted that he had reworked the jury instructions and verdict form. Caught off-guard by the late ruling, defense counsel re-urged a previously made objection to the verdict form and noted general objections to the jury instructions. The case was submitted to the jury on December 4, 2015. The jury found that plaintiff proved by a preponderance of the evidence that it suffered a loss resulting from a conspiracy by the DOTD and its employees to intentionally harm plaintiff, and that defendants Jenkins, Eason, Murphy, and Lacy had “cooperated in, advised or assisted in the destruction of [Mercer’s] business.” The jury then awarded Mercer damages of $7 million for “destruction of business” and $13 million for “loss of future profits.” A judgment in accordance with the jury’s verdict was signed by the trial judge.
Defendants filed a motion for new trial/JNOV on February 26, 2016, which was denied by the trial court on July 29, 2016. Defendants filed the instant appeal, and plaintiff answered the appeal.
I,DISCUSSION
Jury Instructions and Verdict Form
In their first two assignments of error, defendants assert that the trial court erred by failing to properly instruct the jury regarding the applicable law relevant to plaintiffs case and in submitting to the jury a verdict form which failed to correctly address the law, assumed predicate torts which had been dismissed, and was so confusing and legally inaccurate that it led to the jury’s $20 million verdict in favor of plaintiff.
In brief, plaintiff argues that all assignments of error raised by defendants regarding the instructions and verdict form are barred from consideration by this Court because defendants failed to preserve their right to appeal this issue under La. C.C.P. art. 1793(C). Plaintiff also contends that defendants are prohibited from making any arguments regarding the instructions and verdict form that were not asserted before or immediately after the jury retired. Even if the objections were timely made, urges plaintiff, defendants should not be allowed to address this issue because defense counsel failed to adequately or specifically state reasons for their objections on the record at trial.
Defendants vehemently disagree with plaintiffs position, noting that they timely objected to the trial court’s inclusion of intentional interference with contract in the jury verdict form inasmuch as the claim had just been dismissed via directed verdict. Defendants’ main objection was that the Court was allowing this dismissed claim to serve as the predicate tort for conspiracy. Furthermore, the trial court’s revised jury instructions were the result of a surprise ruling that the judge made after the .parties had made their ^closing arguments and right before the case was to be submitted to the jury. This was not a situation where defendants were making specific objections to the instructions and verdict form at a charge conference for which they had adequate time to prepare. Under the circumstances, urge defendants, and keeping in mind the trial court’s obligation under La. C.C.P. art. 1813(B) to inform the parties within a reasonable time prior to the arguments of the general verdict form and instructions (and the • re *1023 quirement that the court give the parties a reasonable opportunity to make their objections), they objected timely and appropriately.
The contemporaneous objection requirement of La. C.C.P. art. 1793(C) is relaxed and appellate review is not prohibited where there is a plain and fundamental error in the jury instructions or interrogatories. Berg v. Zummo, 00-1699 (La. 04/25/01), 786 So.2d 708, 716 n. 5; Nicholas v. Allstate Insurance Co., 99-2522 (La. 08/31/00), 765 So.2d 1017, 1022-24. See also Wegener v. Lafayette Insurance Co., 10-0810 (La. 03/15/11), 60 So.3d 1220; Luquette v. Allstate Insurance Indem. Co., 50,177 (La. App. 2 Cir. 08/12/15), 174 So.3d 736, writ denied, 15-1641 (La. 10/30/15), 180 So.3d 300. As set forth below, we have reviewed the jury instructions and verdict form and have found plain and fundamental errors in both.
The trial court is required to instruct jurors on the law applicable to the cause submitted to them. La. C.C.P. arts. 1792, 1793; Luquette, supra; Abney v. Smith, 09-0794 (La. App. 1 Cir. 02/08/10), 35 So.3d 279, writ denied, 10-0547 (La. 05/07/10), 34 So.3d 864. Adequate jury instructions are those which fairly and reasonably point out the issues and which provide correct principles of law for the jury to apply to those issues. Id.
1 fiThe trial court is responsible for reducing the possibility of confusing the jury and may exercise the right to decide what law is applicable and what law the trial court deems appropriate. The charge must correctly state the law and be based on evidence adduced at trial. Luquette, supra; Georgia-Pacific, LLC. v. Dresser-Rand Co., 15-2002 (La. App. 1 Cir. 10/31/16), 207 So.3d 1131, writ denied, 16-02114 (La. 01/13/17), 215 So.3d 248; Abney, supra.
Louisiana jurisprudence is well established that an appellate court must exercise great restraint before it reverses a jury verdict because of erroneous jury instructions. Id. Trial courts are given broad discretion in formulating jury instructions, and a trial court judgment should not be reversed so long as the charge correctly states the substance of the law. Peironnet v. Matador Resources Co., 12-2292 (La. 06/28/13), 144 So.3d 791; Luquette, supra.
When a jury is erroneously instructed, and the error probably contributed to the verdict, an appellate court must set aside the verdict. In the assessment of an alleged erroneous jury instruction, it is the duty of the reviewing court to assess such impropriety in light of the entire jury charge to determine if the charges adequately provided the correct principles of law as applied to the issues framed in the pleadings and the evidence, and whether the charges adequately guided the jury in its deliberation. Luquette, supra; Georgia-Pacific, LLC, supra. Ultimately, the determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice. Abney, supra. The standard of review in determining whether an erroneous jury instruction has been given requires a ^comparison of the degree of error with the jury instructions as a whole and the circumstances of the case. Luquette, supra; Abney, supra.
Likewise, the jury verdict form may not be set aside unless the form is so inadequate that the jury is precluded from reaching a verdict based on correct law and facts. Georgia-Pacific, supra; Abney, supra. Jury forms or interrogatories that are misleading or confusing may constitute reversible error. Jury interrogatories must fairly and reasonably point out the issues *1024 to guide the jury in reaching an appropriate verdict. Id. If the verdict form does not adequately set forth the issues to be decided by the jury (i.e., it omits an applicable essential legal principle or is misleading and confusing), such interrogatories may constitute reversible error. Id.
The trial court began its jury instructions by admitting that the jury verdict form previously referred to in front of the jury had been rewritten after the trial court’s grant of directed verdict after closing arguments. The trial court gave general instructions regarding the burden of proof, direct and circumstantial evidence, the evaluation of witnesses, etc., and then gave the following instructions regarding plaintiffs remaining claim:
Jeff Mercer, LLC, brings this ' action claiming that the Louisiana [DOTD], Willis Jenkins, John Eason, Pam Higginbotham, Michael Murphy, John Gasaway, Bernard Sincavage, and Barry Lacy destroyed his construction business through conspiracy and intentional interference with his business relations with his prime contractors. A conspiracy is an agreement or combination of two or more persons for the specific purpose of committing an intentional or willful act when in addition one or more 'of the parties, to the agreement or combination does an act or action in furtherance of the agreement or combination.... He who conspires with another person to commit an intentional or willful act is answerable in solido with that person for the damage caused by such act [La. C.C. art. 2324],
. 1 «Defendants point out that the predicate tort of intentional interference with business relations was not in fact submitted to the jury for deliberations, nor were the essential elements for a valid cause of action alleging intentional interference with business relations explained to the jury. We agree, and further find that the jury was not properly and adequately instructed as to the law relative to conspiracy (i.e., that conspiracy is not a stand-alone claim, but must be based on an underlying tort). Based upon our review of the record, the issues to be determined, the evidence at trial, and the instructions given to the jury, we find that the trial court’s instructions to the jury were inadequate and incomplete. Because the jury instructions did not adéquately set forth the issues to be decided by the jury, they constitute reversible error.
Conspiracy by itself is not an actionable claim under Louisiana law. Ross v. Conoco, Inc., 02-0299 (La. 10/15/02), 828 So.2d 546; Thames v. Thames, 50,639 (La. App. 2 Cir. 05/18/16), 196 So.3d 653. In order to recover under a theory of liability, a plaintiff must prove that an agreement existed to commit an illegal or tortious act; the act was actually committed and resulted in plaintiffs injury; and there was an agreement as- to the outcome or result. Thames, supra; Butz v. Lynch, 97-2166 (La. App. 1 Cir. 04/08/98), 710 So.2d 1171, writ denied, 98-1247 (La. 06/19/98), 721 So.2d 473. To establish a conspiracy, a plaintiff is required to provide evidence, of the requisite-agreement between the parties, i.e., the plaintiff must establish a meeting of the minds or collusion between the parties for the purposes of committing an illegal or tortious act. Crutcher-Tufts Resources, Inc. v. Tufts, 09-1572 (La. App. 4 Cir. 04/28/10), 38 So.3d 987.
19To prevail on a claim for tor-tious interference with business, a plaintiff must prove by a preponderance of the evidence that defendants improperly influenced others not to deal with the plaintiff. Bogues v. Louisiana Energy Consultants, Inc., 46,434 (La. App. 2 Cir. 08/10/11), 71 So.3d 1128; Junior Money Bags, Ltd. v. Segal, 970 F.2d 1 (5th Cir. 1992); Dussouy *1025 v. Gulf Coast Investment Corp., 660 F.2d 594 (5th Cir. 1981). The plaintiff must show that the defendants’ actions did more than adversely affect the plaintiffs business; there must be a showing that defendants actually prevented the plaintiff from dealing with a third party. Henderson v. Bailey Bark Materials, 47,946 (La. App. 2 Cir. 04/10/13), 116 So.3d 30. The plaintiff must also prove that defendants were motivated by actual malice. Id.
Regarding the verdict form, defendants contend that it failed to ask the jury whether a viable predicate tort was committed (a requirement for a finding of conspiracy). Instead, the jury was asked whether “plaintiff proved, by a preponderance of the evidence, that Jeff Mercer, LLC suffered a loss resulting from the conspiracy of the Louisiana DOTD and its employees to intentionally harm the plaintiff?” Defendants also note that the jury was never asked whether plaintiff proved that an actual conspiracy within the DOTD existed or that an agreement existed to commit a viable predicate tort in order to intentionally harm plaintiff. Instead, the first question on the verdict form assumes the existence of a predicate tort, then skips to the issue of whether plaintiff proved that it suffered a loss.
We find that the jury verdict form in this case lacked any viable predicate tort from which liability and causation could have been established |1flunder La. C.C. art. 2324 because the only predicate tort listed on the verdict form was intentional interference with contract, which, as noted by defendants in their argument, had previously been dismissed by the trial court via directed verdict. While we observe that the trial court did use the somewhat expansive wording of “by means which include, but are not limited to, intentional interference with the plaintiffs contractual relationship with others,” the court failed to give the jury any other predicate tort from which it could have chosen, such as intentional interference with business relations as pled in Mercer’s initial petition (and as contained in the court’s instructions to the jury). A cause of action for tortious interference with business is separate and distinct from a claim for interference with a contract. See Brown v. Romero, 05-1016 (La. App. 3 Cir. 02/01/06), 922 So.2d 742.
In 9 to 5 Fashions, Inc. v. Spurney, 538 So.2d 228 (La. 1989), the Louisiana Supreme Court recognized a very narrowly defined cause of action for the breach of duty by a corporate officer to refrain from intentional and unjustified interference with the contractual relationship between his employer and a third person. The specific elements for this cause of action are: (1) the existence of a contract or a legally protected interest between the plaintiff and the corporation; (2) the corporate officer’s knowledge of the contract; (3) the officer’s intentional inducing or causing the corporation to breach the contract or his intentional rendering of performance under the contract impossible or more burdensome; (4) absence of justification on the part of the officer; and (5) causing damage to the plaintiff by breach of contract or by rendering performance of the contract | uimpossible or difficult. Id. at 234; Great Southwest Fire Insurance Co., 557 So.2d 966 (La. 1990); Coleman v. Querbes Company No. 1, 51,159 (La. App. 2 Cir. 02/15/17), 218 So.3d 665, 2017 WL 604993; Dhaliwal v. Dhaliwal, 49,973 (La. App. 2 Cir. 11/25/15), 184 So.3d 773, writ denied, 16-0236 (La. 04/04/16), 190 So.3d 1204; Healthcare Management Services, Inc. v. Vantage Health Plan, Inc., 32,523 (La. App. 2 Cir. 12/08/99), 748 So.2d 580.
Keeping in mind the trial court’s incomplete and erroneous instructions on the applicable legal principles of conspiracy *1026 and plaintiffs intentional interference with business relations claim, we likewise find that the verdict form was misleading and confusing and was so inadequate that it precluded the jury from reaching a verdict based on the correct law and facts. As such, we are constrained to reverse the lower court’s judgment.
In Gonzales v. Xerox Corp., 254 La. 182, 320 So.2d 163 (1975), the Louisiana Supreme Court held that, when an appellate court has a complete record in which an erroneous ruling on evidence or an erroneous jury instruction requires the appellate court to set aside the judgment of the trial court, it is not necessary to remand the case for a new trial. Under its constitutional authority to review facts in civil cases, instead the appellate court can render a judgment on the basis of an independent review of the record, without according any weight whatsoever to the judgment or jury verdict. See McLean v. Hunter, 495 So.2d 1298 (La. 1986).
11?De Novo Review-Trial Testimony

Louisville Avenue Project

Plaintiff has claimed that DOTD Inspector Willis Jenkins’ bribery attempts and Mercer’s reports of the incident form the catalyst for a conspiracy among the DOTD and its employees to destroy Mercer’s business. The two comments made by Jenkins were allegedly solicitations of money and a generator to “make the job go better,” or “get anything done on this job.” The record shows that Jenkins made the comments. What is unclear, however, is whether he made them jokingly as he claimed (and three DOTD employees testified) or seriously as claimed by Mercer (and three Mercer employees/family members).
Plaintiff also claimed that retaliatory actions were taken and “retribution” was sought by DOTD inspectors on the project after Mercer reported Jenkins. Specifically, the inspectors refused to accept his work product, made the job difficult and costly, undermined his work, forced him to withdraw from the project, and treated his replacement more favorably.
Jeff Mercer testified that he was hoping that the incident with Jenkins would blow over, but instead, it just inflamed the job situation. Mercer called DOTD District Administrator Marshall Hill several weeks after the comments were made to report the incident to him. When Hill asked Mercer what he wanted done, Mercer asked that Jenkins be removed from the Louisville Avenue jobsite for the duration of the project. After Jenkins’ removal and reassignment, Mercer testified that the inspectors were deliberately failing to mark out sufficient work for his crew to do each day, I ¶ ¿which had them finishing around 9:00 a.m. and cost him $500~$600 per hour in idle crew and equipment.
On May 31, 2007, Inspector Greg Rat-cliff called Project Engineer John Eason for instructions on how Mercer’s crew was to pour the next section of concrete. Mercer stated that they did the work as instructed. When Eason came out to the site, he told Mercer to tear out the concrete they had just poured. Mercer responded, “You have to be joking.” Eason told Mercer, “There will be no more joking on the job. Tear out the concrete.”
According to Mercer, there were additional problems on the Louisville Avenue job, such as a two-week shutdown and the inspectors continuing to “piecemeal” the work. Because of that, the concrete couldn’t help but look bad. He also had a problem with the fact that the inspectors on the project were trying to force him to build non-ADA compliant handicap ramps without giving him a liability release. On July 16, 2007, Mercer sent an email to James Wood with Diamond B asking to be *1027 released from the Louisville Avenue project.
Mercer testified that he went back to the jobsite several weeks later and took photographs. Mercer pointed out that the new subcontractor hired to finish the job was allowed to close the road, which allowed him to have access to and work both sides at one time, something DOTD would never let plaintiff do. They also let the subcontractor remove and replace larger areas of concrete at one time.
On cross-examination, Mercer testified about concerns communicated to him by James Wood with Diamond B, on May 22, 2007, which included a |14lack of progress on the catch basins, and Mercer’s failure to send in cost breakdowns requested by DOTD a few months previously. In his response to Wood, Mercer blamed the lack of progress on plan changes (he claimed that the way DOTD was requesting that he do the work was not the way he had bid or contracted the job) and DOTD’s refusal to let him work both sides of the road. Mercer reasoned that by not allowing him to work both sides of the road, DOTD was affecting his relationship with Diamond B because it further delayed completion of the contracted work.
Wood strongly advised Mercer to cooperate with him and DOTD and complete the catch basins, which posed a safety and liability issue, and noted, “It was in the mutual interest of all three parties that each one abide by their contractual obligations. It takes a lifetime to build relationships and just a short time to destroy them.”
Wood’s concerns were not resolved as evidenced by a June 3, 2007, email he sent to Mercer again addressing DOTD’s and Diamond B’s safety concerns over Mercer’s failure to backfill one of the catch basins which apparently had remained open for more than two weeks while Mercer worked on other jobs. Wood gave Mercer two choices: Mercer could backfill the catch basin, or Diamond B would do it and hope they did not get in trouble with the DBE Dept, for doing Mercer’s work.
Eason apparently communicated his dissatisfaction with a lot of Mercer’s curb-work on the Louisville Avenue job, calling it “unacceptable,” in a letter to Diamond B, Mercer acknowledged that the work probably was not very good since he had to do it “piecemeal.”
11BWillis Jenkins testified that he was an Inspector One on the Louisville Avenue project and at the time of his retirement, he was an Inspector Two. Jenkins stated that he was comfortable where he was in DOTD and to go beyond level two, he would have had to obtain computer skills. As a level two inspector, Jenkins made no decisions as to how a job was laid out, where the stations were marked, etc. He likewise had no authority to stop anyone from doing work on a jobsite; that is the job of the project engineer and lead inspector.
Jenkins testified that he never told Mercer he would put him out of business, nor did he ask or tell anyone else to do so. Jenkins said he had no power or authority, but he was just “eyes and ears on a job” and he was good with that.
Inspector Greg Ratcliff testified that it was ludicrous to think that Jenkins was actually trying to bribe anyone. Ratcliff and Jenkins, as lower level inspectors, are analogous to laborers who can’t make anything happen. When an inspector sees something that is not done correctly, it is his or her job to bring it to the contractor’s attention and recommend adjustments. The next step would be to turn it over to the inspector’s supervisor.
After Jenkins was reassigned, Ratcliff continued to work on the Louisville Ave *1028 nue .project. He didn’t treat Mercer or the crew any different than he has treated people on any other inspection job. No* one at DOTD told him to instruct Mercer to do his curbs in a substandard manner, nor did anyone advise him to treat Mercer more harshly than other subcontractors or try to put him out of business.
| ^Inspector Brad Trichell also overheard Jenkins’ comments. Trichell stated that no one, including John Eason, instructed Tric-hell to treat Mercer or his crew any differently or to treat Mercer so bad that they put him out of business.
Bennett Tripp is Mercer’s brother-in-law and was a member of the crew working on the Louisville Avenue project. Tripp stated they began having problems after the bribe, and that everything they did was wrong. One example is that the curb they poured in front of the furniture store was approved one day, and the next day the inspectors told them they had to move it back. Tripp testified that Jenkins was one of the inspectors involved. While they had problems on sites before and had been required to redo work occasionally, on the Louisville Avenue project it seemed to be constant.
Tripp stated that after Jenkins was removed, one of the inspectors who took his place told them that since his buddy was removed from the project, it would be “living hell until the end.” Tripp stated that the reason Mercer quit the job early was because they couldn’t do anything right.
John Sanderson, who worked as the crew foreman on the Louisville Avenue job, testified that after the incident with Jenkins, things did not blow over. It seemed to him like the inspectors were riding them extra hard and piecing the work rather than fixing it. Tommy Cox, Mercer’s stepfather, also worked the Louisville Avenue job, and he testified that the inspectors didn’t like anything they did, but tore up a bunch of stuff he thought was “done right.”
117Mar shall Hill was the DOTD Monroe District Construction Engineer in 2007. Prior to the Louisville Avenue project, he had worked with Mercer on several other jobs' and had no issues with him or problems between him and inspectors. Hill noted that he removed Jenkins from the project not because of any impropriety but to remove any possibility for conflict between him and Mercer.
Pam Higginbotham worked on the project as the lead inspector under John Ea-son. Higginbotham stated that she last saw Mercer on the job ¿round July 12, 2007. Some concrete had been poured, and it was improperly shaped. When she tried to talk to Mercer about it, he put her off, then left the jobsite before she could talk to him. Higginbotham then talked to his crew, who told her that they were trying to get everything done because they were all going to Disneyworld the next day.
Higginbotham testified that she did not treat Mercer any different than she would have treated any other contractor who did the substandard concrete work she saw. Furthermore, she did not change the way she treated Mercer once Jenkins was taken off the job. Higginbotham related that she was not trying to put Mercer out of business. Quite simply, the curbs had to be straight.
- John Eason was the project engineer on the Louisville Avenue project. He was initially called on cross-examination. He explained that the problems the inspectors were having with Mercer began before Jenkins’ comments were reported to Marshall Hill. For example, • Mercer kept insisting that the inspectors open up excavations on both sides of the road. Regardless of the work that had been marked in ad- *1029 vanee, Mercer wanted to do something | , «different. The day after Jenkins’ removal, Eason was on site and told Mercer that some concrete had to be moved. Mercer told Eason, “You have got to be f|:**ing kidding me.” It was then that Eason made his remark about no more joking on the job. Eason called his own response a knee-jerk reaction to Mercer’s profanity.
On direct exam, Eason explained the Louisville Avenue project in great detail. The project was a pavement and roadway preservation project. The other added items, such as drainage structures and related work, were incidental to the intent of maintaining the pavement. The primary purpose was to cold plane off the old pavement and replace it with new asphalt. Over the years, since the roadway had been built in the early 1930’s, multiple layers of asphalt had been put down until there were approximately six inches of asphalt on top of the old concrete roadway. Also, the six-inch gutters had been filled in with asphalt, which made the curbs completely disappear.
In the late 1990’s, heavy equipment was developed that could grind the asphalt off, take the surface back down and bring it back up so the road would no longer continue being built up to higher levels. This is what “cold planing” or “milling” is. The next step is the patching of failed spots in the concrete, then the laying of a two-inch binder layer of new asphalt. This binder layer restores the smoothness and creates a good surface for the final layer. At that time, drainage and. any necessary curb work is done. The final step is to go back and add a “wearing” surface.
•Station' numbers (which indicate work sites on the project for the engineers and work crews) on the Louisville Avenue project were marked 119out at the beginning of the project. The layout and paint marking were done in the initial project phase ,by a subcontractor, FB&L, not by DOTD employees and not as the project progressed.
There are standard spec plans for the project with specific details as to how each job is to be done; this includes the items of work Mercer subcontracted to do, including removal and replacement of the combination curb and gutter. Furthermore, notwithstanding the contract, plans and applicable “red book” provisions, project engineers and inspectors can always use judgment based on engineering principles and practice for situations that do not fit neatly into a prewritten document.
Eason explained that the original contract for the Louisville Avenue job did not include curb repair. This became necessary after all of the asphalt was milled and they found pieces of curb jutting into the roadway’s wheel path. They then had to take out the broken and dislodged pieces of curb and try to restore the curb face. This was primarily a safety issue, and was not a beautification project; this aspect became added during the project to repair dangerous or unsafe spots. Furthermore, the sidewalks alongside Louisville Avenue were never part of the project in that they belong to the City of Monroe (who planned to replace the sidewalks following completion of the DOTD’s project), although the project did include building handicap ramps at the intersection corners.
Mercer also had work items for adjusting catch basins and making some modifications to other catch basins. There was also an item in the contract for repair of curb and gutter by using pin-on curbs. A pin-on curb | gnas opposed to curb replacement takes less time, involves less work and makes less impact on traffic.
In the discussions between DOTD inspectors and engineers and the contractors about how to repair the curbs, Mercer was involved and, according to Eason, plaintiff *1030 understood and agreed to the pin-on curb method. There was concern because the existing sidewalks did not meet ADA guidelines. However, as noted above, the City was going to be coming along behind DOTD to replace them with ADA-compliant walkways, which would then be tied in to the handicap ramps that DOTD was planning to build.
There were also concerns about obstructions, such as light poles and signs, at the intersections, so they had to move the location of the ramps to the sides to work around the obstructions. Eason explained to Mercer that they would be able to make the handicap ramps ADA compliant as they were built, but they could not make the entire walkway system ADA compliant at the time because the existing sidewalks were not going to be replaced until completion of the DOTD project.
As of May 18, 2007, the pin-on curb pricing had not been resolved because Mercer had not yet provided Diamond B and DOTD with his price breakdown, which had been requested two months earlier. Also, contradicting Mercer’s testimony, Eason stated that the only time Mercer was denied a request to work both sides of the road was when Mercer left an open pit on the same side of the road as an open catch basin that needed to be completed.
|¾1 There were also issues with the quality of finished curb and concrete work done by Mercer’s crew the week of May 14-17. Prior to this time, Eason testified that he had not rejected any of Mercer’s work, although he had previously asked Mercer to do his saw cuttings of the concrete in accordance with the project specs.
As he testified earlier, Eason noted that the area of curb remediation that Mercer was working on May 14-17 had been pre-marked before that part of the project began. Mercer had been given an itemized list of locations of curb repairs and intersections for handicap ramps that showed station by station and quantity on April 10, 2007, before the curb work even began.
Eason testified that the inspectors also had issues with being informed as to when Mercer’s crew would be on the job; there were some days they just didn’t show up. Eason further stated that he never shut down the Louisville Avenue job at any time, nor did he make Mercer remove any new concrete that he had poured.
Eason then described an issue that arose on June 1, 2007, with a catch basin pour. Mercer had requested to be allowed to pour both the walls and the top of the catch basin simultaneously, having previously poured the bottom. Eason denied the deviation, noting that this is not something that can even be done. The walls are formed with plywood or premade forms, then are poured. The walls then must dry or reach a certain strength (a period of two-three days) before the top can be poured. Mercer’s response was that if he couldn’t pour the walls and top together, he was leaving for two weeks. Eason gave Mercer two options: he could backfill the open | ^excavation and come back in two weeks or pour the walls as requested. Mercer poured the walls on June 1.
Thereafter, around June 19, 2007, he, Diamond B and Mercer had disagreements regarding Mercer’s pricing breakdown on quotes for the handicap ramps. Eason noted that the main problem he had with the breakdown was Mercer’s inclusion of non-pay items incidental to the construction as set forth in the red book’s standard specs. Eason noted that they were working collaboratively with Diamond B and Mercer to get the ramps built in a way that would meet ADA standards.
Diamond B sent an email to Eason informing him of Mercer’s intention to do no *1031 further work without additional payment or contract time. In response, Eason informed Diamond B that as of June 21, 2007, he still had no price breakdowns from Mercer for the additional curbing and paving, so he could not approve payment for the items. Negotiation communications went back and forth between Eason and Diamond B, and an email from Mercer dated July 6, 2007, was sent indicating his approval to the price breakdowns agreed upon by DOTD and Diamond B and noting that he would be on site to do the handicap ramps.
On July 10-11, 2007, Eason took pictures of curb work done by Mercer’s crew that he deemed unacceptable. Specifically, there were sections of curb that were irregularly shaped and some that had brush marks throughout the concrete finish, as well as areas of honeycombing or air voids. Eason emphasized that he would not have accepted such substandard work from any contractor on any project. Eason wrote a letter on July 16, |¾¾2007, to Greg Cox and Jeff Wood at Diamond B about the unacceptable curbing, which he advised would not be paid for until it had been redone.
Thereafter, Eason received correspondence indicating Mercer’s withdrawal from the Louisville Avenue project. Diamond B was required to hire another subcontractor to finish the work items Mercer had contracted to do. This included construction of the handicap ramps, which was done by the new subcontractor with no request for release of liability.
Eason stated that he did not try or intend to harm Mercer or his business on the Louisville Avenue project. Instead, he and the inspectors on the job worked hard to provide detailed quantities and drawings on a scale he has never before provided. Eason said that he did so because Mercer was continuing in his father’s business and Pete Mercer had developed good relationships throughout the construction industry. Eason also stated that he never acted, alone or with anyone else, to harm Mercer’s relationship with any prime contractor or with DOTD.
On recross-examination, Eason stated that while he did not agree that removing Jenkins from the job was appropriate, his personal opinion had nothing to do with the job he had to do, which was to get quality work done by the contractor and subcontractors on the Louisville Avenue project.
Eason testified that DOTD would not provide Mercer with a release for the ADA ramps because the plans for the ramps were in accordance with ADA requirements. The feasibility of compliance with ADA specs was known by all parties, including Mercer, who simply chose not to build them. Eason also noted that Mercer’s solution for how to deal with the unfilled catch basin, which'was to barricade it with signs and yellow markers, was ^inadequate, especially in light of the fact that during his excavation, Mercer had uncovered a gas line and rather than back-fill the hole, he chose to leave it open and go to another worksite.
On redirect, Eason noted that the project had to include some sidewalk replacement at locations where, in the process of repairing the curb, Mercer’s crew damaged portions of the walkway. Also, they had to add some linear footage on some locations where the handicap ramps were placed. Nonetheless, the additional quantities never changed the nature of the contract to a sidewalk replacement project.
James Wood was the manager overseeing the Louisville Avenue project for Diamond B. He testified that Mercer’s status as a DBE was important to Diamond B because a specified percentage of their work had to be done by DBEs on certain *1032 federal and state projects. Furthermore, Mercer, had done a lot of drainage and concrete work and it was typically quality work.. Prior to the Louisville Avenue job, DOTD had not complained about Mercer’s workmanship as far as Wood knew.
Wood stated that around May 29, 2007, Mercer called and told him about the Willis Jenkins incident. Wood told Mercer to call and report it to DOTD district administrator Marshall Hill. Wood testified that he wasn’t concerned about retaliation against Diamond B or Mercer, although several days later it did cross his mind as a possibility after DOTD took Jenkins off the job and replaced him with someone else.
Mercer complained to Wood that inspectors were only marking off a few hours of work for his crew. Wood relayed these complaints to Eason or someone else at DOTD. Wood didn’t know why Mercer was putting in | ^concrete in “patches.” Mercer told Wood that he couldn’t do the handicap ramps because they weren’t up to ADA specs. Wood félt like a lot of the problems on the job were caused by project layout by DOTD, but some of them could have been poor workmanship issues as well.
When Mercer withdrew from the project, Diamond B hired Mabry Co. to complete the remaining work. Wood testified that after the Louisville Avenue project, Diamond B hired Mercer as a subcontractor on a couple more jobs. At a preconference hearing on one of those projects, either a project engineer or an area engineer told Wood they weren’t going to be dealing directly with Mercer or any other subcontractors; it was Diamond B’s responsibility to have a superintendent on the job to be the “go-between.” Wood testified that having a superintendent with Mercer (or any other subcontractor) would make them unable to place competitive bids because it would increase costs. This was the first time that DOTD had required Diamond B to do that, and'was a “big” factor in why Diamond B quit using Mercer.
On cross-examination, Wood testified that on previous jobs, he had worked with Willis Jenkins and had “had words.” Wood noted that Diamond B had significant concerns over the incomplete catch basin situation. Wood stated that he was not happy that Mercer was leaving holes on the job-site and failing to finish his work. He also discussed the email that he sent' to Mercer informing him that Diamond B was going to have to backfill- the excavations should Mercer choose not to finish that part of the job prior to moving to another project.
|2BOn redirect, Wood stated that he “possibly” would have used Mercer on further projects had DOTD not made the supervision requirement.
Bama Hinton was on the Louisville Avenue project as an estimator/project manager. Hinton opined that Diamond B did not stand up for Mercer like they should have. However, on cross-examination, Hinton testified that he was not aware of any of the problems Diamond B had with Mercer and would defer to Jeff Wood on the issue.
Cathy Rando, who worked in contract administration in DOTD’s DBE Section, testified that the letter sent by Marc. Din-nat with Diamond B requesting Mercer’s release from the Louisville Avenue project in the summer of 2007 was due to “differences with the department” and did not mention the Willis Jenkins incident. Din-nat requested assistance finding another DBE, since Mercer’s withdrawal from the project left Diamond B approximately $60,000 short of the project’s DBE goal of $95,456.66.
. The above evidence falls woefully short of establishing plaintiffs claims of discrimination or retaliation by DOTD and its *1033 employees on the Louisville Avenue project. There was absolutely no evidence presented to show a connection between the comments made by and replacement of Willis Jenkins and any subsequent actions on this project. Furthermore, plaintiff has failed to show that defendants acted with malice or actually prevented Mercer from dealing with Diamond B as required for a plaintiff to prevail on a tortious interference with business claim. Nonetheless, we will evaluate plaintiffs claims set forth in the two amending petitions, which include conspiracy and collusion to withhold funds, require extra work outside of the contract, change job specs, make jobs more "costly and | gydifficult, make false reports to federal authorities in an attempt to have Mercer’s status as a DBE revoked, threaten prime contractors which resulted in ruining plaintiffs relationships with them, and engage in price fixing, bid rigging and collusion.

1-49 Projects

Jeff Mercer testified that he worked as a subcontractor for prime contractor Austin Bridge and Road (“AB & R”) on the Mira-Myrtis Road project. Their contract was signed on May 19, 2009. Mercer hired Guillot to subcontract some of the dirt work. Mercer stated that he received notices of violations because Guillot had apparently hit some abandoned utility lines. While AB & R was holding Mercer liable, it was Guillot who had to pay the fines.
Mercer built some box culverts on this project. Lane Fouts was AB & R’s project superintendent. Mercer testified that he got an email in April 2010 about a big hole in one of the end box culverts as well as a broken seal slab. A meeting was scheduled in Baton Rouge between DOTD, AB & R, and Mercer to discuss remediation of the problem. Present at the meeting were DOTD people, including Stephanie Ducote and an investigator working for Sheri Le-bas from the DBE Dept., representatives from AB & R, and some people from the FHWA. The meeting turned out to be about all of the 10 x 10 box culverts and three different slabs. Mercer, understood that DOTD was to be held accountable if the seal slabs were broken, and if not, the rework would be at Mercer’s cost.
Bennett Tripp testified that he worked on the T.J. Lambrecht 1-49 job laying pipes, drains, and boxes. Tripp stated that they had problems with alasfew inspectors on this job with backfilling and undercutting. The inspectors were making them put in red dirt, which causes the boxes and joints between the boxes to shift-when the dirt caves and cracks. They also had problems with moisture. Depending on the type of bedding they were required to use, it was either too wet or too dry.
Tripp testified that he didn’t work either ' 1-49 job for the entire time of the project because Mercer fired then rehired him during both jobs. They had moisture problems on the AB & R 1-49 job for the same reasons they did on the T.J. Lambrecht project. Tripp wasn’t on the AB & R job when the boxes were originally put down, but he was on the job when they relaid them.
John Sanderson stated that inspectors on the T.J. Lambrecht job were different and were “super hard” on them. For example, they required Mercer to remove filler cloth from pipe joints, refill areas they had previously undercut, and use dirt for bedding.
John Gasaway testified on cross-examination that he was a DOTD inspector on both 1-49 projects. Gasaway was the inspector on most of the work done by Mercer. For work he deemed unacceptable, Gasaway had the authority to get the prime contractor to correct the situation or report it to his own supervisor, Michael *1034 Murphy, who was DOTD’s project engineer on both jobs.
Gasaivay testified that a good foundation is important for structural integrity. When they find an unsuitable bottom elevation (i.e., a non-yielding foundation) after excavation, they have to remove the bad soil and replace it with either sand, bedding material (usually rock), or type Aj^backfill (stone). However, on the 1-49 jobs they put back in a more dense material,
Gasaway stated that he got written up over the 10 x 10 box situation by Murphy. He was unable to recall whether he got approval from Murphy before Mercer installed the boxes. Gasaway noted that he knew before the boxes went in that they extended over the concrete slab. However, DOTD’s design called for the boxes to overhang the concrete slab. Mercer suggested putting down additional bedding or concrete, which they did.
According to Gasaway, he was inspecting the boxes' as Mercer was installing them. Mercer wasn’t putting the boxes in properly, and Gasaway knew- it. Mercer was having problems putting RAM-NEK (flexible gasket strips designed to be a sealant) between adjacent boxes; specifically, he couldn’t keep the RAM-NEK up on the box sides. Mercer asked Gasaway whether he could put the RAM-NEK across the top and bottom of the boxes, then put them together before going inside the boxes to put RAM-NEK in the joints where they abutted. Gasaway testified that he took Mercer at his word that this process would work because Mercer was the experienced contractor. However, Gasaway emphasized that he didn’t do his job for DOTD when he allowed Mercer to do it his own way.
Gasaway testified that he was reprimanded for letting Mercer put the boxes together as he requested. The “blue book” calls for it to be done the other way, and Mercer knew what the book required. According to Gasaway, Mercer couldn’t keep the RAM-NEK in place doing it “by the book” or contract specs and Mercer was worried about excessive operating expenses. Thus, Gasaway was trying to work with Mercer.
RnGasaway told his supervisors what he had acquiesced to, which had then allowed Mercer tó assemble and install the boxes in two days. His superiors were not pleased and told him that Mercer should not have been permitted to put the boxes in without following the specs for the proper application of RAM-NEK. Gasaway,tes-tified that he, exceeded his authority when he approved Mercer’s request. Gasaway wasn’t the one who rejected the work; his superiors did after he told them. Gasaway testified that no matter what, the contractor is ultimately responsible for his work product. This is what both the contract and blue book say.
Gasaway testified that Mercer was not treated unfairly by the DOTD, but was treated just like all other contractors Gas-away has had dealings with. Gasaway stated that he didn’t know who had reported Mercer to the FBI; he. had nothing to do with that.
On direct examination, Gasaway testified that he is one of the defendants in this lawsuit. He stated that he worked with Mercer a lot and helped him whenever he could. Gasaway said that he didn’t do anything to try to put Mercer out of business. Because these were the first 10 x 10 boxes Gasaway had worked on, he relied on Mercer’s experience and knowledge in the area. As a result, Gasaway said he ended up with a verbal reprimand, a bad evaluation, and a divorce.
Michael Murphy testified on cross-examination that he was the DOTD project engineer on both 1-49 projects. He stated *1035 that there were problems with erosion of the bedding on both jobs. Murphy testified that he had Mercer use clay soil as bedding, which was not a deviation from the specs’ requirements. Murphy noted that the contract encompassed not only |srthe specs, but supplemental specs, the “blue book” and DOTD’s quality control manual. Murphy stated that he also went thicker than the plans required, below the established grade, and had Mercer remove the material that was there and replace it with a better material.
Mercer was paid three times the embankment price, although what was put in was not granular material. This was pursuant to Brian Buckel’s orders. Originally, Mercer had been paid for excavation and embankment for the area that was removed and replaced. Murphy stated that he had no reason to like or dislike Mercer, although they did at times have heated discussions.
Murphy testified that he and Lane Fouts, AB & R’s on-site project manager, had discussed taking Mercer off the 1-49 job because Murphy’s inspectors (particularly Gasaway) were having a hard time getting their work done. Murphy stated that this is something he would have done with any other contractor or subcontractor they were having difficulty with personnel-wise. This is the reason Murphy asked AB & R to have someone with Mercer “24/7.” AB & R already had personnel on the job, although no one specifically “babysitting” Mercer.
Murphy testified that his request was not an interference with the relationship between Mercer and his prime contractor; it was Murphy’s job to manage the project, including personnel, and get the job done. When asked whether he threatened Inspector Gasaway, Murphy said that he did, but not for being too easy on Mercer. Instead, the reason was because Gasaway did not follow the specs for the project. Murphy testified that he reprimanded Gas-away verbally and in writing.
| S2When asked about responsibility for the problems with the 10 x 10 boxes, Murphy stated that as the subcontractor, it was on Mercer. All of the problems started, as Murphy recalled, when the end boxes broke off the concrete slab. Before that time, the gaps between the boxes had not been an issue. Fouts with AB & R felt that the box failures were caused by a seal slab that was too short. Fouts opined that because the slabs had been formed and placed under the direction of DOTD, the department should have borne responsibility for the cost of replacing the boxes. Murphy stated that this is not what the contract provides. Murphy testified that he was following Buckel’s orders when he had Mercer remove and replace the boxes. Murphy also stated that he did not report Mercer to the FBI.
On direct examination, Murphy rebutted Mercer’s allegations of price rigging and bid manipulation when Murphy discussed the bid process and specifically noted that some of the successful bidders on projects Mercer complained about (because his was not the low bid) did cast in place boxes, not precast boxes as Mercer claimed.
Lane Fouts was the AB & R 1-49 project manager. Fouts wasn’t certain, but he thought this was the prime contractor’s first job working with Mercer. Michael Murphy was their point of contact for this project. Murphy recommended that Mercer use a high PI soil for bedding. Mercer complained to Fouts that this was a violation of the project’s special bedding provisions. Mercer also had a dispute about the pricing. Murphy told them that DOTD was only prepared to pay for the cost of the bed slab itself. Murphy denied as inappropriate other costs that Fouts had request *1036 ed, such as per diem, travel, and overhead for Mercer.
| ^Mercer also had an issue with the inspectors/engineers telling him to install six inches of bedding on top of what he called “muck.” Because “as directed by the engineer” is stated throughout the specs,' if they are told to do work a certain way, they do so and it doesn’t work, Pouts would then go to DOTD and explain the situation. Fouts testified that Mercer wouldn’t have done the bedding the way it was done on this project had he not been specifically instructed to so. Mercer had to do “re-work” because of the swampy soil conditions, which caused delays.
Less than a year after Mercer installed the precast boxes, it was discovered that the end boxes had fallen or broken off the slab. Pouts reminded DOTD that the seal slabs and boxes had been done under the direction of and 'had been inspected by DOTD personnel. Pouts requested that DOTD pay for correcting the slab/boxes. Murphy’s response was that DOTD would pay for repairing a broken slab (had there been one), but everything else would be done at Mercer’s cost.
Fouts testified that gaps between the 10 x 10 boxes did not even becóme an issue to DOTD until the end boxes fell. He noted that the boxes had been accepted and paid for by DOTD after their installation. Pouts compared the joint spaces in Mbrcer’s boxes with the spaces in boxes installed by another subcontractor on an adjacent project and conceded that the other boxes did not have gaps as large as those between the boxes on the AB & R project.
Fouts testified that all of the things Mercer complained about, the bedding, the 4-inch, concrete slab, delays, and nonpayment were construction issues directly related to the project. Specifically, the basis of Mercer’s | ^complaints was that he was reading the contract and specs one way, and DOTD was ■ reading them another. Fouts observed that this particular DOTD district was a very “difficult” one to work in for everyone, including Fouts as the project manager. .
Dan Holycross, southeast regional manager for AB & R, testified that Fouts kept him informed of problems or potential issues with Mercer by telephone and email. The biggest issues were the 10 x 10 pre-’ cast boxes and the slab. Holycross noted that senior management terminated Fouts after the 1-49 job because of “relationship issues” with their client, DOTD. Holycross testified'that no one from DOTD, on the I-49 job or any other project, said or indicated that they were out to get Mercer.
Brian Buckel was the chief construction engineer at DOTD during the time of the two AB & R projects. Buckel was not assigned, to directly oversee work, in Shreveport district; he was in the headquarters office. There were problems with the boxes installed by Mercer on 1-49, as well as some complaints asserted by Mercer, who had requested a meeting, so Buckel felt that he needed to inspect the situation himself. Buckel emailed Mercer that he was coming to the jobsite and reminded Mercer that it was DOTD procedure for Mercer to go through his prime contractor, AB & R, who would then address any concerns with the district and project engineer. Buckel also assured Mercer that he would be treated just like any other contractor.
Buckel took video footage and pictures of his box culvert inspection. There were numerous problems with the boxes install-: ed by. Mercer, including numerous joints with no RAM-NEK, joints with 3-3½ inch openings (when they should have been ½-1 inch) between the boxes, silt and | aBwater infiltration, and open joints at the bottom of some of the boxes. At the meeting in *1037 Baton Rouge, Mercer argued that the base material and slab under it were falling apart and cracking, which caused the joints to open. Buckel testified that this was not the case.
Buckel told AB & R that the boxes were unacceptable and had to be removed and reinstalled. If a broken slab was found, DOTD would pay for the slab being relaid. If the slab was intact, DOTD would not pay for the removal and reinstallation because the failure would have been caused by poor workmanship. Buckel pointed out that the blue book provides that the responsibility for redoing unacceptable work is on the contractor/subcontractor, and there is no payment owed. This situation was not personal, but applies to all contractors and subcontractors.
Buckel noted that the slab was in good shape, except for at the. very end. Mercer removed and replaced the boxes. According to Buckel, the joints were much better this time. While Mercer was paid for originally putting the boxes in, he was not due payment for their reinstallation pursuant to the contract.
Bernard Sincavage testified on cross-examination that he began working for DOTD in June 2009, He first dealt with Mercer on the AB & R 1-49 job; they met on June 30, 2010, when Sincavage attended the meeting with the DBE Dept.’s Compliance Section in Baton Rouge, which was held because Mercer had complained of unfair treatment. The actual problem was a construction issue, i.e., a payment dispute over the 10 x 10 boxes and the condition of the concrete slab, which had nothing to do with Mercer’s status as a DBE.
| salt was ultimately determined that the boxes fell off the slab because the gaps between boxes were too -wide,1 which pushed the boxes out to beyond where they should have been. On May 14, 2010, Sincavage informed AB & R that Mercer’s 10 x 10 boxes were unacceptable as installed.
Sincavage understood that Mercer had a temper. Apparently Mercer had threatened a couple of DOTD employees on the project, including Wall and Gasaway. Sin-cavage stated that he never had a problem with Mercer, didn’t report him to the FBI, and didn’t know who did. On direct examination, Sincavage testified that no one told him to “put Mercer out of business."
Barry Lacy was the DOTD construction claims engineer. His duties included reviewing contract disputes between contractors and DOTD field inspectors/engineers and assisting in approving plan changes. He is also a work zone and absence and audit engineer for the State of Louisiana. He reviewed the claim made by Mercer that the project engineers and inspectors on the 1-49 job were treating him unfairly, and confirmed that Mercer’s complaint was actually based on contract interpretation. Lacy apparently let one of Mercer’s claims for compensation sit on his desk for two years without addressing it. Lacy admitted that this claim “slipped through the cracks,” and that when it was brought to his attention by IVIurphy and Holyeross, he was prompt to evaluate it. However, because Mercer was seeking to be “paid twice” for the 10 x 10 boxes, i.e., once for their installation (in 2009, Mercer was'paid $586,000) and once for the removal and reinstallation (he was asking $608,000 for redo work), Lacy denied the claim.
|37DBE Contract Administration Manager Cathy Rando testified that the DBE program performed a commercially useful function analysis on the AB & R 1-49 project. During this study, they found that Mercer was leasing and utilizing equipment from, an unlicensed (and thus DBE unapproved) contractor, as well as having this contractor’s employees working on the *1038 project on Mercer’s payroll. Mercer’s failure to use his own workforce and equipment (i.e., owned or approved lease) caused AB & R to fall short of DBE program requirements.
Rando testified that she never said or did anything with an intent to put Mercer out of business. She personally liked him and always wished him success with the DBE program.
From 2007-2010, Staci Messina served as director of the DOTD’s Compliance Section, which included all civil rights programs, including the DBE program. This section addressed strictly civil rights concerns, not issues involving construction/workmanship quality, work performance, or contract interpretation. Messina noted that this includes the issue of nonpayment of a subcontractor whose failure to get paid results from the prime contractor’s nonpayment by the DOTD because of problems with construction quality or workmanship. Messina testified that the DBE program doesn’t require that the prime contractor pay a subcontractor for work that has neither been performed nor paid for by DOTD. DBE regulations, as do the contracts between the parties, provide for payment of the subcontractor by the prime contractor once the prime contractor has received the funds.
IssMessina testified that Mercer never made a discrimination claim to her. Had he done so, Messina would have turned it over to her Title VI specialist or referred him to the FHWA to investigate, since the DBE department cannot investigate a DBE complaint against the DOTD itself. Messina stated that the FHWA oversees the Louisiana DOTD. Joe Bloise, who has now retired, was the assistant district administrator for the Baton Rouge office of the FHWA, and Charles Harkless is the DBE specialist for the FHWA in Baton Rouge. Messina testified that, in response to Mercer’s complaints to the DBE department, Cathy Rando went to the 1-49 job-site and did a commercially useful function study. She found that there was equipment and some operators performing work on the job that Mercer himself was supposed to be doing. This was a violation of the federal rules governing the DOTD. They had to inform both Bloise and Harkless of the violation. Messina noted that in doing so, she was not acting maliciously, nor was she trying to put Mercer out of business.
Stephanie Ducote, who was Messina’s replacement as DBE program director, testified that Mercer’s complaints were turned over to DOTD’s legal section due to pending litigation between Mercer and DOTD. When someone from the Office of the Inspector General contacted the DBE Dept, asking for Mercer’s files, Ducote was obligated to turn them over. She did not intend to put Mercer out of business by her words or actions, nor did anyone at DOTD instruct her to harm Mercer or ruin his business.
| wBastrop/Log Cabin Project
Mercer testified that he signed a contract with AB & R for this project on July 17, 2008. He had a few safety issues on this project, such as equipment bumping into other pieces of equipment. He also had problems with AB & R withholding payment from him, and DOTD failing to approve requests for payment. One of the main claims Mercer had was related to undercut; AB & R wouldn’t pay him because DOTD would not approve it.
While on cross-examination, Mercer stated that on December 6, 2011, he sent a letter to AB & R’s attorney seeking an explanation for the company’s refusal to pay him. The attorney’s reply was:
Jeff, as you have been told before, bond notwithstanding, Austin will not furnish *1039 any payment to Mercer unless and until you, Jeff Mercer, LLC, return to the project and complete your scope of work. You’ve been asked to do so on numerous occasions and have refused. Therefore, Mercer is in default and Austin is exercising its right to complete your scope. All costs resulting from Mercer’s default will be charged against Mercer.
Mercer then sued AB & R in Baton Rouge to collect approximately $8 million in contractual damages.
Mercer stated that he sent documentation of his claim to Joe Bloise with the FHWA, as well as Gloria Hardiman-Tobin with the DBE Dept., alleging that DOTD had consistently treated him unfairly in federally funded projects. Bloise told Mercer that he would conduct an investigation, but Mercer had to support his allegations with specific details. Mercer also sent Bloise information about DOTD’s refusal to pay him for redoing the 10 x 10 boxes on the 1-49 project.
Mercer admitted that he left both the AB & R 1-49 and Bastrop/Log Cabin jobs before they were finished because DOTD was not paying him. |4nWhen asked about his refusal to comply with Dan Holycross’s demand that he use a different size mandrel on the rest of the AB & R 1-49 job, Mercer claimed that the DOTD put Holy-cross up to that. Mercer felt that he was justified in not returning to the 1-49 job at that time because it would have cost too much for him to remobilize.
Tripp testified that they had problems on the Bastrop/Log Cabin project with utility delays. No one had properly marked them off, and the deadline date for moving them was too far out. He couldn’t remember, but felt like they probably had cut some live lines while on that job. Tripp stated that it wasn’t long after this project that Mercer closed his business because he couldn’t get any jobs.
Sanderson testified that the Bas-trop/Log Cabin job went well except for the utility delays and undercut problems. There was a lot more undercut than they had expected because of rotten soil. Mercer shut down before the Bastrop job because he was going broke and was not going to be able to break even on the job.
Steve Spohrer is a licensed professional engineer who, at the time of the Bas-trop/Log Cabin project, worked with LTM (Louisiana {Transportation Infrastructures Management for Economic Development} Managers), on the program that was created by a constitutional amendment providing for a .04 per gallon gas tax to build four-laned roads on north/south routes in Louisiana as well as two bridges across the Mississippi River. Some of the roads included in this program were US Hwy. 165 through Monroe, US Hwy. 167 to Mansfield, and La. Hwy. 15 (now US 141 Hwy. 425) from Ferrriday to Rayville. Spohrer testified that once all of the projects were done, the TIMED program ceased.
LTM managed projects for DOTD that it had carved out of the TIMED program and assigned to their joint venture. In this undertaking, LTM personnel served as managers or project engineers of projects for DOTD, which was considered the owner of the projects. As such, DOTD would still hire prime contractors, bids would be let, and the prime contractors would hire subcontractors. Spohrer testified that he was the deputy construction engineer over the project engineers. He knew Jeff Mercer from other LTM-managed projects.
Spohrer stated that once the notice to proceed was issued (telling the contractors that the utilities had been relocated) on the project, contractors and subcontractors were still under obligation to phone Louisi *1040 ana One Call prior to digging. The notice to proceed does not indicate the absence of gas, sewer, or other utility lines. State law puts the responsibility on the contractor, not DOTD, to be certain that the utilities are cleared.
Spohrer testified that there was a significant delay in relocating the utilities on the Bastrop/Log Cabin project. However, how Spohrer handled the delays and claims filed was not with the intent to put Mercer out of business. He testified .that at. no time did anyone at DOTD tell him to handle the utility, delay situation or deny Mercer’s utility claims in a manner that would hurt Mercer’s business. When the delay situation arose, he and the LTM staff had to .come up with a viable plan to deal with how the delays would be handled by the prime contractor and subcontractors. This was no different than any other time he has handled a utility delay situation.
142Spohrer discussed the utility delay claim and request for a change order filed by AB & R. Because AB & R had submitted documentation establishing their entitlement to the amount requested, approximately $1.7 million, they were paid. No claims for subcontractors were included in the initial filing by AB’ & R, but resolution of those delay claims was held open pending them submittals. The process was to be the subcontractor first turning in a claim for utility delays to AB & R, who would then submit it to the project engineer.
Mercer submitted a claim asking for more'than $1.53 million for utility delays. Spohrer took the spreadsheet Mercer prepared and reduced the equipment rates to contract-approved rates, and hours and days sought to actual hours and dates that he knew Mercer was standing by and not able to work (according to project engineer records which were recorded by LTM inspectors .on a day-to-day basis, as well as the software Site Manager). Spohrer reiterated that DOTD had no input into his calculation; he came up with the amount approved, approximately $80,000, based upon his professional training and experience, as well as a close reading of the contract between AB & R and DOTD.
There was also a dispute regarding undercuts on the Bastrop/Log Cabin project. Prior to bidding on undercutting on a job, the contractor and subcontractor have access to the plans, proposal, and soil bor-ings. They also should make a site visit. After a bid is submitted and accepted, the contractor and subcontractor are bound by contract to follow through with-what the contract requires at the bid prices, regardless of whether the quantity of work for that specific item increases.
[¿¡¡Because the actual undercutting was so much more than the quantity contained in the bid, Mercer made a request for equitable compensation. According to Mercer, the excess in undercut was a hidden pre-existing condition that entitled him to additional compensation. However, Spohrer testified that any contractor, not just Mercer, who bids undercut at a particular price, will be paid that same unit price for all undercutting done. The contractor is paid to dig out the bad material and replace it with good material he has brought in at the prices he agreed to when he turned in his bid; this is standard practice on any project where the undercut amount increases.
Spohrer stated that he has paid other contractors who experienced increases in undercut on other projects in exactly the same manner: in accordance with the unit price they bid. Spohrer pointed out that on the Glenmora/Woodworth job, which LTM also managed for DOTD, Mercer was paid for undercut just as .he was on the Bas-trop/Log Cabin project.
*1041 Spoher testified that he had discussions with Dan Holycross, AB & R’s southeast regional manager, about Mercer’s undercut claim. Spohrer acknowledged that it was within Mercer’s right to assert his equitable claim, but noted that it was also within DOTD’s rights to stick to the terms of the parties’ contract and pay Mercer pursuant to his contractual obligation.
Spohrer testified that Mercer walked off the project before his work was finished.
On cross-examination, Spohrer testified that neither DOTD nor LTM was aware that there would be that much' undercut on the Bastrop/Log Cabin project. The estimated amount of undercut was 10,000 cubic yards, and the Uactual amount was approximately 88,000 cubic yards. Nonetheless, the parties are bound by the price set forth in the contract.
Spohrer stated that anything that came in as a claim, such as a subcontractor’s claim for utility delays, involved Barry Lacy from DOTD. If what came in was only a request for additional compensation, thén Brian Buckel from DOTD was involved. When asked why a letter indicating DOTD’s response to Mercer’s delay claim was more than two years after the payment of AB & R’s utility delay claim, Spohrer testified that he and DOTD had to wait that long for additional documentation and justification from Mercer.
Dan Holycross, southeast regional manager for AB & R .at the time of the Bas-trop/Log Cabin project, testified that the utility delays had been projected to bes180 days. In fact, it took more than a year before all of the utilities weré cleared. Trent Livingston was AB & R’s project manager and Gary Icenogle was the project engineer for LTM.
Mercer attempted to mobilize on more than one occasion to progress the work, and hit several live and' inactive utility lines. Both Icenogle and Mercer were aware when they began .clearing operations that they were cutting lines. Lacy stated that the fact that the utilities weren’t relocated within the contractual time frame delayed the completion date of the entire project, including Mercer’s portion of the work.
Mercer inquired several times about his utility delay claim. Holycross told him they needed to sit down and go. through the claim because “the DOTD had many comments regarding yours.” Holycross reassured Mercer that AB & R had also been back and forth with DOTD and Holycross in order Lfito get paid for their delay claim. One example Holycross gave was that Mercer requested compensation for his mother’s time, when there is no compensar tion for home overhead expenses.
When asked about the increased undercut claim and the position taken by DOTD and Spohrer that the increased volume was not a new item and- therefore would be paid as bid, Holycross opined that because there was significantly more undercut than the amount set forth in the contract, there should have been an adjustment. He continued to work on the undercut claim for Mercer with DOTD until its denial by DOTD on-May 17, 2012.
Brian Buckel testified that DOTD hired LTM to manage this project. Steve Spohrer with LTM was like the chief construction engineer of the project. While state TIMED money was coming in, there were lots of four-lane projects going, on. Also still in effect was the federal American Recovery Act. States were competing to get as many road jobs in place as they could because the more jobs they had, the more money they got under the ARA. The 1-49 segments were ARA projects. Buckel pointed out that the ARA money was from a “one time” fund. Buckel testified that there are very few large projects (on In *1042 terstates or four-lane roads) in the state since both of these projects have ended. Furthermore, there are more people bidding on the limited number of jobs available to bid.
The Bastrop/Log Cabin project was widening La. Hwy. 425 to four lanes. Buckel became aware of the embankment and utility delay problems involving Mercer after the fact, when they became claims situations. Buckel testified that he did not instruct Spohrer to reject or reduce Mercer’s utility delay claim or make change orders in undercutting to put Mercer out of | ^business. According to Buckel, his actions manifested his intention, which was to follow the contract between DOTD and AB & R. If there were change orders made, they were done in keeping with the terms of the contract.
Buckel discussed the subcontract between AB & R and Mercer for the project, and the contract between AB & R and DOTD. He noted that when a prime contractor signs a contract with DOTD to do a certain quantity of undercut for a certain price and the quantity exceeds the amount in the contract, DOTD pays for the- increase pursuant to the set price bid in the contract. Paying the undercut pursuant to the contract bid amount on this project was not done to put Mercer out of business. This is what the spec book provides for and is what has been done on many jobs.
As to the issue of utility delays, Buckel testified that normally when there are utility lines to be moved, the contractor will go in and clear the right of way and either pull off the job temporarily or, because they have mobilized to the job, start working on the project around the utility companies. Buckel noted that even when the “notice to proceed” has been issued, contractors still have to call La. One Call. Whenever there are'delays in moving utilities, and a contractor seeks money for the delays, DOTD must track the claim for the exact costs. In this case, LTM, as the project manager, had the responsibility for tracking the costs. It was Buckel’s job to investigate the utility delay claims once they were submitted.
Buckel identified the worksheet showing ■ Spohrer’s adjustment of Mercer’s utility delay claim and noted that the adjustment was done by Spohrer as project manager. Neither he nor anyone else at DOTD told Spohrer to - deny Mercer’s utility delay claim to put him out of business or in | ^retaliation for suing the DOTD. Likewise, Buckel said that he has not, through words or actions, alone or in conspiracy with others, tried to put Mercer out of business.
Bernard Sincavage testified that he had the responsibility for change orders on the Bastrop/Log Cabin project. Mercer submitted a claim for an increase in embankment because the quantity he bid on was significantly lower than the actual amount on the project. Sincavage reviewed the claim and recommended that the additional undercut should be paid at the contract unit price, which was the price that Mercer bid. Sincavage stated that no one at DOTD told him to form this opinion in some plan to put Mercer out of business, nor did he make his decision for any other reason than that it was his professional opinion.
Barry Lacy testified that he was involved in evaluating the claims filed by Mercer on the Bastrop/Log Cabin project. According to Lacy, DOTD denied one, paid one, and paid the third claim at unit prices. Lacy went through several DOTD bids submitted by plaintiff to show that the low bid was always accepted. Therefore, when Mercer’s bids were not accepted, it was because they were not the lowest ones. DOTD is required to follow state law, which requires that they accept the lowest *1043 bid made. Lacy also testified that he did not report Mercer to the FBI.

Other Testimony

Mercer testified that he worked several jobs as a prime contractor for DOTD. One of these projects was Oliver Road in Monroe. He signed the contract with DOTD on April 28, 2010. Denmon Engineering were the inspectors on that job. As the prime contractor, Mercer was paid directly by UsDOTD. He was able to complete that job with no problems. The work was approved on March 14, 2011, by Marshall Hill, as well as two people who are named as defendants, Brian Buckel and Barry Lacy. Mercer also got paid utility delays on this project.
Mercer also discussed a copy of a contractor’s notification of a contract dispute for the Shed Road project he did for DOTD around June 2011. Listed as issues were: inspectors failing to timely mark items, which cost him money and time; DOTD sending back 14 yards of concrete with time remaining on the truck just because he didn’t have neat cement on the tie bars; and, no bid items on patches for irregular areas in middle of road. When defense counsel asked Mercer who the inspectors on this job were, Mercer stated that they did not include Higginbotham, Murphy, Gasaway, Ratcliff, Trichell, Eason or Jenkins.
When defense counsel asked Mercer why he did not expand his business, he stated that he could have bid jobs in Texas but he was raising two daughters by himself, his crew didn’t want to work there, and the specs were different. Mercer stated that he didn’t bid jobs for private entities, or for other public entities such as parish school boards and cities, because their contracts are too small and without state funding, he would have had to “drop down” considerably. When asked about bidding on federal projects other than with DOTD, Mercer stated that he didn’t know how to do so.
On redirect, Mercer testified that AB & R was the only prime contractor he had sued, although there were several others who owed him money. According to plaintiff, he “let it go” with them to preserve those Unrelationships. Mercer testified that prior to the Louisville Avenue project, he had never left any job early, and had always been paid for his work.
Dr. Daryl Burckel, CPA, CVA, testified as an expert for defendants to refute plaintiffs claim that they had ruined his business. It was Dr. Burckel’s opinion that DOTD did not force the closure of Jeff Mercer, LLC, and cause him to suffer any losses beyond 2011 based upon the following information:
(1) Mercer still had his license to operate and his DBE status was intact, so he could still bid jobs.
(2) Plaintiff was not prevented from bidding for other jobs with DOTD, local municipalities or private organizations.
(3) At the end of 2011, Mercer had earned an average of over $7.1 million per year for the years 2007-2011.
(4) Mercer had working capital of $6.7 million.
(5) Mercer had equity in the business of $9.9 million.
(6) Plaintiff had only $96,823 of long-term debt.
(7) There was no reasonable or supportable expectation that plaintiff would experience the same level of revenue and profits into the foreseeable future as experienced from 2007-2011 due to the decline in future LTM and 1-49 work.
*1044 Analysis
Louisiana law protects a businessperson from malicious or wanton interference, while permitting interferences designed to protect legitimate interests of the actor. Bogues, supra. In the instant case, there is overwhelming evidence that most, if not all, of the allegedly wrongful and malicious actions taken by DOTD and its employees were done not with the intention of putting Mercer out of business, but instead were done in furtherance of legitimate and protectable business interests, mainly, the department’s (and employees’) statutorily mandated duties and obligations of overseeing and managing the construction and maintenance of safe roads and highways within the State of Louisiana.; There has further been | ^insufficient evidence that, acting alone, much less by agreement or concerted effort, defendants’ actions qualify as violations of LUTPA[4] or constitute intentional interference with a contract as defined by the Louisiana Supremé Court in 9 to 5 Fashions, supra.[5]
CONCLUSION
For the reasons set forth above, the judgment of the trial ■ 'court is REVERSED. We hereby RENDER judgment in favor .of defendants, State of Louisiana through the Department of Transportation and Development, Willis Jenkins, John H. Eason, Michael Murphy, and Barry Lacy dismissing all of the claims asserted against them by plaintiff, Jeff Mercer, LLC, Costs of this. appeal are assessed against plaintiff, Jeff Mercer, LLC.
APPLICATION FOR REHEARING
Before BROWN, PITMAN, GARRETT, STONE and COX, JJ.
Rehearing denied.

. Hereinafter, "Mercer” will be used interchangeably to refer to Jeff Mercer and his LLC.

. Individual defendants named in the petition were DOTD Inspectors Willis Jenkins and Pam Higginbotham and DOTD Engineer John Eason.

.Among those named in this first amending petition were DOTD Engineers Michael Murphy and Bernard Sincavage, Inspector John Gasaway, and Claims/Audit Engineer Barry Lacy.

. Pursuant to LUTPA, it is unlawful to engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. La. R.S. 51:1405(A). In order to recover under LUTPA, a plaintiff must prove some element of fraud, misrepresentation, deception, or other unethical conduct on the part of the defendants. Cheramie Services, Inc. v. Shell Deepwater Production, Inc., 09-1633 (La. 04/23/10), 35 So.3d 1053; Bogues, supra. It is only conduct that offends established public policy and is immoral, unethical, oppressive, unscrupulous or substantially injurious that is prohibited by LUTPA. Id. LUTPA does not prohibit sound business practices, the exercise of permissible judgment, or appropriate free enterprise .transactions, nor does it forbid a business to make money or pursue profit, even at the expense of competitors, as long as the means used are not egregious. Id.

. Based upon our disposition of this case, we do not reach the other issues raised by the parties on appeal,