BROWN, Chief Judge.
11 Plaintiff, Floyd Walsworth, Jr., appeals from the trial court’s granting of summary judgment in favor of defendant, Chesapeake Louisiana, L.P., and Chesapeake Operating, Inc. For the reasons stated herein, we affirm.

Facts and Procedural Background

The summer of 2008 was an extraordinary time for Northwest Louisiana, which was experiencing something akin to a modern day gold rush due to development of the Haynesville Shale. In the summer of 2008, landowners in South Caddo Parish began to organize into groups to negotiate mineral leases. Two groups, the Go Get-ters and the Graham Group, joined together and represented hundreds of small landowners with a total ownership of more than 800 acres. Plaintiff, Floyd Wals-worth, Jr., was a member of the Go Get-ters. To help their negotiations, the groups retained oil and gas attorney A.L. “Lang” Wedgeworth.
On July 8, 2008, defendant, Chesapeake (“CHK”), proposed and delivered to the combined group an “Agreement to Lease” setting forth the basic terms of CHK’s offer — $20,000 per acre signing bonus, three (3) year term, and 1/4 (25%) royalty. *1268 The Agreement to Lease included a provision stating:
Chesapeake’s offer is subject to the execution of a mutually agreed upon paid up form of Oil and Gas Lease, in the form as attached herein as Exhibit “A.” (Emphasis added).
Attorney Wedgeworth revised the proposed Agreement to Lease by replacing the provision quoted above with the sentence “Chesapeake’s offer is subject to the execution of a mutually agreed upon paid up form of Oil Land Gas Lease.” The change deleted the phrase concerning the form attached thereto.
On September 10, 2008, Wedgeworth forwarded to CHK an extensive lease form containing lessor-friendly obligations, including provisions that would: (1) subordinate the lease to a mortgage; (2) require CHK to drill an offset well within 120 days of completion of a competing well located within 330 feet of the leased property and not included in a pooled unit; (3) render CHK liable for surface damages unlimited by the fair market value of the leased property; (4) require CHK to use certain “hospital-grade mufflers” on its equipment; and (5) prevent CHK from recovering any overpaid royalties except out of future royalties due. These terms were essentially the same as previously approved by CHK on behalf of a separate group Wedgeworth represented.
On or about September 18, 2008, the members of group executed Wedgeworth’s revised Agreement to Lease.
On October 8, 2008, Wedgeworth wrote CHK asking whether it “had finalized its response to the proposed form of lease and the rider?” Wedgeworth then followed up a week later asking, “Does Chesapeake have any proposed revisions to the lease form ... ?” CHK formally responded to the group on October 17, 2008, informing them that:
... after careful examination of the form of Mineral Lease and Rider provided CHK in connection with said Agreement, CHK must reject your proposed form. Further, given the state of the economy and dramatically reduced gas prices and lease values, we do not believe we could agree on a mutually acceptable form of lease at this time. Therefore, CHK must regretfully withdraw its offer to lease as outlined in said Agreement. (Emphasis added).
|sTwo years later, on October 10, 2010, plaintiff filed the instant action claiming that CHK repudiated the Agreement to Lease, thereby breaching the contract in bad faith. Plaintiff sought a declaratory judgment finding the Agreement to Lease to be a valid, binding, and enforceable contract and ordering specific performance or, alternatively, damages. On July 19, 2012, defendant filed a motion for summary judgment seeking a dismissal of plaintiffs claims in their entirety because there was no binding Agreement to Lease property at a future date. In granting defendant’s motion for summary judgment, the trial court held that:
The executed Agreement to Lease did not result in a binding Agreement specifically because the undisputed facts indicated that the parties understood that their Agreement to Lease was tantamount to a letter of intent which contemplated additional negotiations, to wit: finalizing the lease form.
As a result of this adverse ruling, plaintiff appealed.

Discussion

Appellate courts review summary judgments de novo, using the same criteria that govern the district court’s consideration of whether summary judgment is appropriate. Cote v. City of Shreveport, *1269 46,571 (La.App.2d Cir.09/21/11), 73 So.3d 435. The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of actions. La. C.C.P. art. 966(A)(2). The procedure is favored under Louisiana law and shall be construed to accomplish these ends. Id. Summary judgment shall be rendered “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if [4any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law.” La. C.C.P. art. 966(B).
CHK admits that it made an offer in its delivery of the Agreement to Lease. The basic principle of the law of contract is that no one is bound to perform a contract unless an offer was made by the offeror and accepted by the offeree. In this case, the lessee and the lessor negotiated and agreed on the bonus, royalty and term. A lease form was to be prepared. The group’s attorney, Wedgeworth, rejected the form attached by CHK to its offer and presented to CHK a form that copied a previous form in a similar case that CHK had accepted. Internal memos among CHK’s employees indicated that CHK was amenable to Wedgeworth’s proposed lease form. However, the market for gas had plummeted, and CHK was no longer willing to pay the large sums set forth in its original offer.
The parties agreed to the essential terms of the lease; however, the lease form remained to be written. In such a case, the parties each have standard boilerplate terms which are technical in style and usually drafted by legal counsel. In this case, Wedgeworth deemed the proposed terms he submitted to be significant and material.
When, in the absence of a legal requirement, the parties have contemplated a certain form, it is presumed that they do not intend to be bound until the contract is executed in that form. La. C.C. art. 1947. A contract to enter into a lease at a future time is enforceable by either party if there was agreement as to the thing to be leased and the rent, unless the parties understood that the contract would not be binding until reduced to | ¿writing or until its other terms were agreed upon. La. C.C. art. 2670. Enforcement of a contract to lease is not available if the parties understood that the contract would not be binding until reduced to writing or until its other terms were agreed upon. In such cases, “the contract is [merely] inchoate, incomplete, and either party, before signing, may ... recede ...” La. C.C. art. 2670, Comment (C). These conditional contracts are often referred to as “letters of intent.” When LOIs contemplate some further conditions being fulfilled, such as a subsequent written contract being executed, the parties are not bound, and are therefore free to walk away, until those conditions are satisfied. Graham v. Chesapeake Louisiana, L.P., 2013 WL 5673858 (W.D.La. October 16, 2013); Ballard v. XTO Energy, Inc., 784 F.Supp.2d 635 (W.D.La.2011).
The fundamental question in this case is whether the Agreement to Lease and Wedgeworth’s revision constitute a contract between the parties. An analysis of their provisions will show that they do not constitute a contract. Initially an offer was made by CHK. The proposal was to have the terms of the agreement reduced to writing so that there could be no uncertainty as to the terms of the contract. Instead of accepting the contract proposed by defendant, the landowners, via their attorney, submitted their own proposal and specified the terms and conditions. It was a counteroffer or proposition for a contract. Plaintiff, in making this counter *1270 offer, deemed these terms material, and it is not for the court to say that they were immaterial. When plaintiff submitted this counteroffer to defendant, only one of two courses of action was open to defendant. It could accept the goffer made and thus manifest that assent, which was essential to the creation of a contract, or it could reject the offer. There was no middle course.
Plaintiff contends that there is an abundance of evidentiary proof that shows that CHK approved the Wedgeworth lease form and communicated that approval to the landowners before it backed out of the agreement. Plaintiff asserts that the internal emails of CHK and the deposition testimony of the two main landowners, Maurice Graham, who represented the Graham Group, and Jerry Cook, who represented the Go Getters Group, who engaged directly with CHK’s agents, show that CHK did in fact approve Wedge-worth’s lease form, but subsequently backed out, in bad faith, when market conditions changed. Some of these instances, as set forth by plaintiff, include:
1. Deposition testimony of Graham and Cook stating that CHK’s contract agent, Joey Kovach, informed them that the proposed lease form was approved prior to their signing the Agreement to Lease.
2. A September 15, 2008,. email chain from CHK’s agent, Steve Denny, to his boss, David Luke (CHK’s land-man employee), with a copy to Luke’s boss, Brad Kemp (middle management of CHK), transmitting Wedgeworth’s proposed lease form. The email acknowledged that CHK had previously approved this lease form for another group Wedgeworth represented. The email chain spoke of needing to review the subsurface clause. Subsequently, on September 19, 2008, Luke transmitted an email to all, including Kemp, saying that the subsurface clause issue had been resolved. No other issues with the lease form were mentioned.
3. After Wedgeworth emailed CHK’s contract agents regarding the status of CHK’s review of his proposed lease form on October 8, 2008, Luke sent an interoffice email that stated “read it again ... it is fine ... and yes, we ok’d this already. — how could I forget the hospital grade muffler.”
4. Thereafter, an internal chain of CHK emails laying out a plan to at first delay payment of the lease bonuses until 2009 and denying 17bonuses to those who will not wait. Then the agents question whether they want to go through with the deal anymore. Ultimately Gary Dunlap, CHK’s Vice-President, determines that the best way to get out of the deal is to proclaim that they are unable to reach a mutually agreeable lease form and that as a result CHK is withdrawing its offer to lease.
Defendant submits the deposition testimony of Wedgeworth to support its claim that there was no agreement on a lease form in the present case. Wedgeworth testified that at no time prior to the execution of the Agreement to Lease or thereafter did CHK communicate to him that the group’s lease form had been approved. In fact, CHK asserts, it was Wedgeworth himself who rejected CHK’s originally proposed lease form attached to the Agreement to Lease and revised the Agreement to state that the lease form would be negotiated and agreed upon in the future, which revisions Graham and Cook approved. This action, defendant contends, is what rendered the agreement nonbinding.
*1271 While we are sympathetic to plaintiffs plight, the facts and evidence in this case are clear. Wedgeworth, with the group representatives’ approval, rejected CHK’s proposed lease form and proposed his own lessor-friendly lease form to CHK. While a representative of CHK may or may not have informed Graham and/or Cook prior to their signing the Agreement to Lease that CHK approved the Wedgeworth lease form, the Wedgeworth revised Agreement to Lease clearly stated that “Chesapeake’s offer is subject to the execution of a mutually agreed upon paid up form of Oil and Gas Lease.” This provision not only required the contract to lease to be reduced to writing, it also acknowledged the state of the ongoing negotiations. As such, the Agreement to Lease was reduced to an | sunenforceable contract that CHK was free to remove itself from unilaterally. See ASJ Interests v. Chesapeake Louisiana LP, 2012 WL 2357313 (W.D.La. June 20, 2012).
Plaintiff argues that CHK is liable for damages for failing to negotiate the terms of the lease in good faith as required by La. C.C. art. 1759, which states that good faith shall govern the conduct of the obli-gor and the obligee in whatever pertains to the obligation. Conversely, plaintiff contends that the suspensive condition of approval of lease form is deemed met under La. C.C. art. 1772, which states that a condition is regarded as fulfilled when it is not fulfilled because of the fault of a party with an interest contrary to the fulfillment. To find CHK liable under either of these theories would negate the purpose of La. C.C. art. 2670. The parties executed a nonbinding Agreement to Lease. CHK, like plaintiff, was free to rescind its offer/acceptance at anytime prior to execution of the mutually agreeable lease form. On behalf of the group, Wedgeworth revised the Agreement to Lease and rejected CHK’s proposed lease form and submitted his own lessor-friendly lease form. These acts transformed the Agreement to Lease into a nonbinding Letter of Intent.
Plaintiff cites forth numerous cases dealing with articles 1759 and 1772.[1] These cases, however, are all distinguishable as none of them 19address the issue of an unenforceable and nonbinding LOI. It has been widely held that the duty to act in good faith extends only to situations in which an obligation has been created. Here, defendant had no legally binding obligation on which to base a duty to act in good faith since there was no enforceable contract. See Liljeberg v. Hospital Corp. of America, 1989 WL 30272 (E.D.La. March 28,1989).[2]
Considering the aforementioned, we find that the Agreement to Lease executed between the parties was a nonbinding and unenforceable contract. As such, no breach was committed by CHK, and the trial court correctly granted CHK’s motion for summary judgment. Furthermore, as this court previously held, all of plaintiffs *1272 claims are “subsumed by” and necessarily fall as a result of this finding.[3]

Conclusion

For the reasons stated, the trial court’s granting of defendant’s motion for summary judgment is affirmed. Costs of this appeal are assessed to plaintiff,' Floyd Walsworth, Jr.

. Retail Merchants Ass'n, Inc. v. Forrester, 47,936 (La.App.2d Cir.05/15/13), 114 So.3d 1175; Bloom's Inc. v. Performance Fuels, L.L.C., 44-259 (La.App.2d Cir.07/01/09), 16 So.3d 476; Grimsley v. Lenox, 93-1618 (La.App.3d Cir.09/14/94), 643 So.2d 203, writ denied, 94-2547 (La.12/09/94), 647 So.2d 1117; Schollian v. Ullo, 558 So.2d 776 (La.App. 5th Cir. 1990), writ denied, 564 So.2d 324 (La.1990).

. The reason, however, that CHK rejected the counteroffer was because the price of gas fell to a level that the price initially agreed to would be unprofitable. Regardless of CHK's reasons, without an acceptance of the terms of the offer, there is no contract. This rule permits the seller when the price soars and the buyer when the price dives to escape an unfortunate bargain.

. This matter has been before this court twice on writ applications. In granting defendant’s second writ application, we directed the trial court to enter judgment dismissing all claims as a result of its ruling on the parties’ cross-motions for summary judgment.