STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

CW 21-247


CP MARINE OFFLOADING, LLC

VERSUS

CLARENCE A. MILLER, JR., INDIVDUALLY AND AS TRUSTEE
OF THE MILLER FAMILY TRUST and MAUREEN ANN TALBOT
MILLER AS TRUSTEE OF THE MILLER FAMILY TRUST


**********

ON SUPERVISORY WRITS FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2020-3388
HONORABLE DAVID A. RITCHIE, DISTRICT JUDGE

**********

SYLVIA R. COOKS
CHIEF JUDGE

**********

Court composed of Sylvia R. Cooks, Chief Judge, Shannon J. Gremillion and
Charles G. Fitzgerald, Judges.


**WRIT GRANTED AND MADE PEREMPTORY.**


O'Dowd Law Firm, LLC
Timothy O'Dowd
Jared W. Shumaker
924 Hodges Street
Lake Charles, LA 70601
(337) 310-2304
Attorneys for Defendants-Relators,
    Clarence A. Miller, Jr. Individually
    and as Trustee of the Miller Family Trust and
    Maureen Ann Talbot Miller as Trustee
    of the Miller Family Trust

**Kean Miller, LLP**
**Troy J. Charpentier**
**Matthew B. Smith**
**Jourdan E. M. Curet**
**Post Office Box 3513**
**Baton Rouge, LA  70821-3513**
**(225) 387-0999**
**Attorneys for Plaintiff-Respondent,**
**CP Marine Offloading, LLC**

**Cooks, Chief Judge**.

CP Marine Offloading, LLC (CP Marine) sued Clarence A. Miller, Jr. (Miller) individually and as Trustee of the Miller Family Trust (The Trust), and Maureen Ann Talbot Miller as Co-Trustee of the Miller Family Trust (Co-Trustee) alleging breach of contract and tortious interference with contract. The Trustees on behalf of The Trust filed an exception of no cause of action and Miller, individually and as Trustee filed exceptions of no cause of action and no right of action. The trial court denied the exceptions. The Trustees and Miller individually timely filed supervisory writs challenging the trial court's interlocutory rulings.

These exceptions are determined by examining the well-pleaded facts of Plaintiff's petition and answering the questions of law presented. The determination of whether the trial court erred in denying Defendants' exceptions presents questions of law, thus, we conduct a *de novo* review.

> In *Spears v. American Legion Hospital,* 00–865, pp. 3–6 (La.App. 3 Cir. 1/31/01), 780 So.2d 493, 495–97 (emphasis added), we discussed appellate review of an exception of no cause of action and the limited action for negligent interference with a contract in Louisiana:
>
>> A peremptory exception of no cause of action presents a question of law, thus on this appeal we review this issue de novo. *City of New Orleans v. Board of Com'rs,* 93–0690 (La.7/5/94), 640 So.2d 237. The peremptory exception of no cause of action is designed to test the legal sufficiency of the petition by determining whether plaintiff is afforded a remedy in law based on the facts alleged in the pleading. *Everything on Wheels Subaru, Inc. v. Subaru South,* 616 So.2d 1234 (La.1993).

*Mier v. Mier*, 15-378 p. 3 (La.App. 3 Cir. 11/4/15), 178 So.3d 270, 272–74.

CP Marine bases its right to proceed against The Trust and Miller on the premise that the letter of intent sent by CP Marine dated November 16, 2019, is a "Letter Agreement" creating a contractual obligation on The Trust to "reach" a Lease Agreement in good faith. This is a gross mischaracterization of the Letter

Agreement. **The Trust is not bound to *reach* a Lease Agreement**, in fact, the Letter expressly provides that there is no Lease Agreement *unless and until* The Trust is satisfied with all terms of the "**proposed**" Lease Agreement and **it expressly provides either party may walk away**. All that the Letter obligates The Trust to do is to 1) negotiate "exclusively" with CP Marine for a period of sixty days; 2) make a good faith effort *to try to reach* a Lease Agreement acceptable to both parties; 3) grant right of entry over The Trust's land limiting such activity to light vehicles and foot traffic *for the purpose of determining if the land is satisfactory* for CP Marine's intended use; and 4) constrain The Trust to keep its "negotiations" with CP Marine confidential. The Letter requires CP Marine to "indemnify and defend [The Trust] from and against any claims for personal injury or property damage arising from [CP Marine's] activities" permitted by the provision in the Letter. This "Letter Agreement" is at best a conditional contract to make a good faith effort to attempt to reach a Lease Agreement and it clearly provides that any Lease Agreement reached must be reduced to writing with terms agreed upon by both parties. In *Walsworth v. Chesapeake Louisiana, L.P.*, 48,588, pp. 5-6 (La.App. 2 Cir. 11/20/13), 128 So.3d 1266, 1269–70, *writ denied*, 13-2957 (La. 2/28/14), 134 So.3d 1177 (emphasis added), the Second Circuit sets forth the applicable law succinctly:

> When, in the absence of a legal requirement, the parties have contemplated a certain form, it is presumed that they do not intend to be bound until the contract is executed in that form. La. C.C. art. 1947.

> A contract to enter into a lease at a future time is enforceable by either party if there was agreement as to the thing to be leased and the rent, **unless the parties understood that the contract would not be binding until reduced to writing or until its other terms were agreed upon**. La. C.C. art. 2670.

2

Enforcement of a contract to lease is not available if the parties understood that the contract would not be binding until reduced to writing or until its other terms were agreed upon. **In such cases, "the contract is [merely] inchoate, incomplete, and either party, before signing, may ... recede ..."** La. C.C. art. 2670, Comment (C). These conditional contracts are often referred to as "letters of intent." When LOIs contemplate some further conditions being fulfilled, such as a subsequent written contract being executed, the parties are not bound, and are therefore free to walk away, until those conditions are satisfied. *Graham v. Chesapeake Louisiana, L.P.,* 2013 WL 5673858 (W.D.La. October 16, 2013); *Ballard v. XTO Energy, Inc.,* 784 F.Supp.2d 635 (W.D.La.2011).

....

Instead of accepting the contract proposed by defendant, the landowners, via their attorney, submitted their own proposal and specified the terms and conditions. It was a counteroffer or proposition for a contract. Plaintiff, in making this counteroffer, deemed these terms material, and it is not for the court to say that they were immaterial. When plaintiff submitted this counteroffer to defendant, only one of two courses of action was open to defendant. It could accept the offer made and thus manifest that assent, which was essential to the creation of a contract, or it could reject the offer. There was no middle course.

Likewise, here, CP Marine alleges that Miller, as Co-Trustee for The Trust, made offers, counteroffers, and demands on CP Marine, some of which it says it found agreeable and others it found entirely unacceptable. CP Marine says it chose not to accept certain of The Trust's terms and in its own words felt if it agreed to certain of Miller's terms the contract, from its perspective, would be "unenforceable." Of course, that was its prerogative, as it was The Trust's to eventually walk away from a Lease Agreement after the minimum 60-day period elapsed without an agreement being reached.

CP Marine's petition does not allege that there is a Lease Agreement, and all parties admit that no Lease Agreement concerning the Trust's acreage was ever entered. Since no Lease Agreement was ever perfected there can be no action for breach of contract against The Trust and no action against Mr. Miller either individually or as Co-Trustee. Neither can there be any action against Mr. Miller

3

in any capacity for tortious interference of contract, even if such an action existed (which our courts have thus far refused to create except for one very limited circumstance). CP Marine acknowledges that neither the law or jurisprudence in Louisiana recognize such an action against Mr. Miller individually or as Co-Trustee, but they assert that we should create such an action by simply extending the Louisiana Supreme Court's holding in *9 to 5 Fashions Inc. v. Spurney*, 538 So.2d 228 (La.1989) which allowed such an action against a corporate officer under a very restricted holding. The Supreme Court has refused to go beyond its professed extremely limited holding in *9 to 5 Fashions* as has this court and our sister circuits. This case certainly does not present a compelling set of alleged facts to "go where no man has gone before."

> To the extent that these allegations constitute a claim for tortious interference with business relations, this court notes that this cause of action has been viewed by Louisiana courts with disfavor. *JCD Mktg. Co. v. Bass Hotels & Resorts, Inc.,* 01–1096 (La.App. 4 Cir. 3/6/02), 812 So.2d 834. "Louisiana courts have limited this cause of action by imposing a malice element, which requires that the plaintiff show the defendant acted with actual malice." *Id.* at 841. Similarly, to the extent that the allegations against the LeBlancs constitute intentional interference with contract this cause of action has likewise been very limited in its application and requires a showing that the actions complained of were intentional, as opposed to merely negligent. *See Spears v. Am. Legion Hosp.,* 00–865 (La.App. 3 Cir. 1/31/01) 780 So.2d 493. Additionally, as we recognized in *Spears,* "in *9 to 5 Fashions Inc. v. Spurney*, 538 So.2d 228 (La.1989), the Louisiana Supreme Court recognized a narrowly defined cause of action for the breach of duty by a corporate officer to refrain from intentionally and unjustifiably interfering with a contractual relationship between the officer's corporate employer and the particular plaintiff," which cause of action has been limited by this court to its facts. *Id.* at 496 (quoting *Healthcare Mgmt. Servs., Inc. v. Vantage Healthplan, Inc.,* 32,523, p. 3 (La.App. 2 Cir. 12/8/99), 748 So.2d 580, 582). Notably, however, the supreme court has expressly declined to recognize a cause of action for negligent interference with contract. *Great Southwest Fire Ins. Co. v. CNA Ins. Cos.,* 557 So.2d 966 (La.1990).

*Brown v. Romero*, 05-1016 pp. 6-7 (La.App. 3 Cir. 2/1/06), 922 So.2d 742, 747, *writ denied*, 06-480 (La. 5/5/06), 927 So.2d 315.

4

This case boils down to simply this, CP Marine locked in nine leases with landowners surrounding The Miller Trust property; CP Marine says it knew that it would not go forward with its project unless it could obtain a lease over all ten adjoining parcels; CP Marine's own conditional "Letter Agreement" acknowledges that no Lease Agreement had been reached with The Trust; CP Marine admits in its petition there is no Lease Agreement; nevertheless, CP Marine forged ahead spending money on its project before getting a lease agreement with the Trust; CP Marine would not accept The Trust's proposed terms; now CP Marine wants to find a way to recover from the Trust what it has spent on its project.

Plaintiff's petition and Letter are replete with references to CP Marine's "proposal;" to "proposed options;" to what "would be paid" to the Trust *if* a lease agreement was reached; to "counter proposals"; the Trust's right to not be "legally bound to any option or lease until a written lease option agreement is agreed upon in writing and signed by all the necessary parties." The Letter specifically states in the introductory paragraph "it is **intended** that the Lease Option Agreement *will* contain, among other terms and conditions" (emphasis added) certain "material business points" set forth in the Letter.

The seventeen enumerated points set forth in the Letter are all drafted by CP Marine and set forth provisions and requirements *it* wanted in the proposed Lease Agreement. The Letter also provided CP Marine *could* decide, at any time during the sixty-day period commencing upon the signing of the Letter by The Miller Trust, that it would not enter any Lease Agreement and simply walk away. The Letter also provides that CP Marine and/or The Trust **could terminate the "Letter Agreement" upon written notice to the other party "in the event the Tenant and the Landlord fail to execute the Lease Option Agreement within sixty days (60) days of the date this Letter Agreement is countersigned below"**

(emphasis added). The Letter was countersigned by the Miller Trust on November 16, 2019. Mr. Miller signed his name on the Letter "For and on behalf of the Miller Family Trust."[1] There is no allegation that Mr. Miller was acting on his own behalf when he signed the Letter or when he sent proposed language to CP Marine. CP Marine prepared the Letter with a signature line designated "For and on behalf of the Miller Family Trust." Indeed, it asserts that Mr. Miller owed a fiduciary duty to The Trust in his capacity as a co-trustee and that he somehow breached that duty *by not entering into* a final Lease Agreement which he as a Co-Trustee of the Miller Family Trust clearly had the option to walk away from. CP Marine tries to bootstrap its non-existent claim by saying that Mr. Miller's *failure to come to an agreement*, largely it seems on CP Marine's terms, was a breach of his duty to the Trust beneficiaries and presumably to The Trust. But Miller, acting for the Trust, was under no obligation to come to any agreement. CP Marine couches its assertion in terms of Miller's agreement to negotiate "exclusively with the Tenant [CP Marine] in good faith for at least sixty days." There is no allegation that Miller, his Co-Trustee, or The Trust negotiated with any other entity during that time-period. There are, however, allegations in CP Marine's petition that Mr. Miller, on behalf of The Trust, did negotiate with CP Marine, but they

---

[1] A. If a trustee makes a contract that is within his powers as trustee, or if a predecessor trustee has made such a contract, and if a cause of action arises thereon, the party in whose favor the cause of action has accrued may sue the trustee in his representative capacity. A judgment rendered in the action in favor of the plaintiff shall affect or be satisfied out of the trust property.

B. A beneficiary may intervene in such an action for the purpose of contesting the right of the plaintiff to recover.

C. The plaintiff may also hold a trustee who makes a contract personally liable on the contract, if the contract does not exclude personal liability. *The addition of the word "trustee" or the words "as trustee" together with language identifying the trust, after the signature of a trustee to a contract, shall be deemed prima facie evidence of an intent to exclude a trustee from personal liability.*

La.R.S. 9:2125 (emphasis added).

6

were unwilling to agree to the demands made on behalf of The Trust. CP Marine does not allege that these demands were against the interest of The Trust or its beneficiaries, it simply asserts that *it* could not possibly agree to such demands because, it alleges, "The Trust's demands would have resulted in an agreement which would allow CP Marine no recourse if The Trust refused or failed to comply with the obligations imposed upon it by the [Lease] [A]greement." Further, says CP Marine in its petition, "These demands would have resulted in an unenforceable contract." While it makes clear that The Trust's terms were not acceptable to CP Marine, this allegation does not state a basis for asserting that Miller or The Trust acted in bad faith. To the contrary, it actually indicates Miller made multiple efforts at good faith negotiations over a period of several months well beyond the required sixty-day period.

As further indication in CP Marine's petition that Miller actually tried to negotiate a Lease Agreement acceptable to the Trust in whose interest he was charged with acting, CP Marine alleges in its petition that *it sent a reply to Miller's demands* "agreeing to many of the changes requested by The Trust including by removing language requiring refund of option payments made to The Trust in case the failure of conditions necessary for consummating a lease were caused by The Trust's default under the terms of the option." CP Marine further acknowledges in its petition there were back and forth negotiations and references its "concessions notwithstanding." Its petition states that it replied to The Trust's "March 2020 response on April 8, 2020, by agreeing to many" of The Trust's proposals. It further states that on May 26, 2020, The Trust responded to its counter proposal with a continued demand "that any option agreement include language precluding any 'liability whatsoever on the part of the Miller Family' and waiving any right to seek specific performance on the part of The Trust." CP Marine alleges in its

7

petition that on that date, some four months well past the exclusive sixty-day period which commenced on November 16, 2019, The Trust informed it in writing that "it was withdrawing from any further negotiation with CP Marine." It clearly had an unfettered right to do so according to the very allegations of CP Marine's petition and evidenced in its attachments thereto and made a part thereof.

In determining the propriety of Defendants' exceptions, we must constrain our analysis to the "well-pleaded" facts. Unsupported conclusory remarks in CP Marine's petition do not constitute well-pleaded facts. After setting forth the numerous ways in which Miller is alleged to have engaged in negotiations with CP Marine attempting to reach a mutually agreeable Lease Agreement concerning The Trust property, CP Marine then states that Miller somehow breached his obligation "to use his best efforts to agree in good faith upon the terms and conditions of a lease option agreement." This is, again, a complete mischaracterization of The Trust's obligation. Miller, acting for The Trust, **was not obligated to sign anything in the end**, in fact, **CP Marine admits he had the absolute right not to enter any agreement binding The Trust.** *Miller's obligation properly stated was merely to negotiate with CP Marine in a good faith **attempt** to reach a Lease Agreement acceptable to both parties.* As pointed out, many of CP Marine's allegations in its petition indicate Miller did just that.

Significantly, there is absolutely no allegation in this petition as to any manner in which Miller acted in bad faith during the negotiations. The petition merely makes the conclusory remark that Miller did not use his "best efforts" which CP Marine seeks to establish largely by the mere fact that no Lease Agreement was reached. This falls far short of any well-pleaded fact that might bespeak a cause of action or right of action against The Trust or Miller individually

8

for acting in bad faith. Moreover, there are simply no factual allegations of bad faith set forth in CP Marine's petition.

> Under Louisiana law a party can act in good faith and be negligent. In fact, the Louisiana Supreme Court recently rejected the negligence standard:
>
>> ***Although it is clear that "bad faith" or "lack of good faith" in this context means something more reprehensible than ordinary negligence, imprudence or want of skill,*** **it is apparent that our courts have perceived the terms to include some forms of gross fault as well as intentional and malicious failures to perform.**
>
> *Great Southwest,* 557 So.2d at 969 (emphasis added); *see also Bond,* 607 So.2d at 867 ("The term bad faith means more than mere bad judgment or negligence, it implies the conscious doing of a wrong for dishonest or morally questionable motives."). At oral argument, counsel for the banks properly conceded that he knew of no case in Louisiana or anywhere else that stated that negligence is a breach of good faith.

*Am. Bank & Tr. of Coushatta v. F.D.I.C.*, 49 F.3d 1064, 1067–68 (5th Cir. 1995).

The Louisiana Civil Code does not define "good faith," but it did define "bad faith" in the past. The U.S. Fifth Circuit discussed the former code article and the jurisprudence in *Am. Bank & Tr. of Coushatta*, *Id*. at 1066–67 (5th Cir. 1995) (footnotes omitted) (emphasis added):

> The Louisiana Civil Code does not define "good faith," but it does define "bad faith" as "an intentional and malicious failure to perform." La.Civ.Code Ann. art. 1997 cmt. c (West 1987). Following Louisiana law, the district court then equated "good faith" with the lack of "bad faith." *See, e.g., Great Southwest Fire Ins. Co. v. CNA Ins. Cos.,* 557 So.2d 966, 969 (La.1990); *Bond v. Broadway,* 607 So.2d 865, 867 (La.Ct.App.1992), *cert. denied,* 612 So.2d 88 (La.1993); *see also Commercial Nat'l Bank v. Audubon Meadow Partnership,* 566 So.2d 1136, 1139 (La.Ct.App.1990) (analyzing bad faith as the mirror image of good faith); *Heirs of Gremillion v. Rapides Parish Police Jury,* 493 So.2d 584, 587 (La.1986) (**implying that a party has acted in good faith unless he has acted in bad faith**). *The court held that the FDIC's actions may have been negligent, imprudent, or bumbling, but because they were not intentionally malicious, the banks could not state a claim.*

9

On appeal, the banks challenge the court's definition of good faith. They argue that the duty to act in good faith is breached not only by acting in bad faith but by any of three other standards of care. They are, in descending order of stringency, (1) violations of the Golden Rule, (2) negligence, or (3) gross fault. Alternatively, the banks argue that even under the district court's bad faith standard—a standard more lenient to the FDIC than any of their three candidates—the court should have denied the FDIC's summary judgment motion in light of the banks' evidence of the FDIC's self-dealing.

We reject the banks' three definitions of breaches of good faith: the Golden Rule, negligence, and gross fault. We also agree with the district court that a trier of fact could not reasonably conclude on the facts of this record that the FDIC acted with malice.

The current version of La.Civ.Code art. 1997 "Obligor in bad faith" no longer defines "bad faith" however, the comments to the article state that the new version "does not change the law."

> An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform.
>
> Comments.
>
> (a) This Article is new. It does not change the law, however. It reproduces the substance of C.C. Art. 1934(2) (1870).
>
> (b) An obligor is in bad faith if he intentionally and maliciously fails to perform his obligation.
>
> (c) This Article uses the term "bad faith" rather than "fraud," the term used in C.C. Art. 1934 (1870). The French version of that Article used *dol,* which is not exactly fraud. Moreover, the same term of art should not be used to designate two different things. In the context of vices of consent, "fraud" means a stratagem or machination to take unfair advantage of another party. "Bad faith" better conveys the intended meaning here, that is, an intentional and malicious failure to perform. This includes most of the meaning of the French *dol.* A truly fraudulent failure to perform of course, would constitute bad faith under this Article.

La.Civ.Code art. 1997.

In *Favrot v. Favrot*, 10-986, pp. 16-18 (La.App. 4 Cir. 2/9/11), 68 So.3d 1099, 1109–10, *writ denied*, 11-636 (La. 5/6/11), 62 So.3d 127 (footnotes omitted)

(emphasis in original), the Fourth Circuit discussed an obligor's duty to act in good faith:

> Judicial inquiry, however, into an obligor's (or even in some cases an obligee's) good-faith performance of the obligation is not triggered by the morality of a party's intentions but is initiated only when the obligee has proven a *failure to perform* an obligation. Stated another way, we do not examine a party's good faith (or bad faith) *unless and until* we find that the party has failed to perform an obligation, from which the obligee has sustained damages. "An obligor is liable for damages caused by his failure to perform a conventional obligation." LA. CIVIL CODE ART. 1994. The extent of the obligee's recoverable damages is then determined according to whether the obligor failed to perform in good faith or in bad faith. "An obligor in good faith is liable only for the damages that were foreseeable at the time the contract was made." LA. CIVIL CODE ART. 1996. In contrast, "[a]n obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform." LA. CIVIL CODE ART. 1997; *see also* Revision Comments–1984 (b) ("An obligor is in bad faith if he intentionally and maliciously fails to perform his obligation.").

> Thus, judicial determination of good-faith (or bad-faith) failure to perform a conventional obligation is always preceded by a finding that there was a failure to perform, or a breach of the contract. *See, e.g., Delaney v. Whitney Nat'l Bank,* 96–2144, p. 18 (La.App. 4 Cir. 11/12/97), 703 So.2d 709, 718 (where terms of a nonqualified retirement plan and an Excess Plan agreement between employer and employee were at issue, the evidence showed "disagreement and confusion" but not "deliberate malice." This court stated, "Bad faith generally implies actual or constructive fraud or a refusal to fulfill contractual obligations, not an honest mistake as to actual rights or duties."); *Adams v. First Nat'l Bank of Commerce,* 94–0486, p. 2 (La.App. 4 Cir. 9/29/94), 644 So.2d 219, 222 (where a home mortgage note was at issue, "a breach of contract occurs if *contractual* discretion is exercised in bad faith, a term connoting fraud, deception, or sinisterly-motivated nonfulfillment of an *obligation.*" (emphasis in original)); *Roba, Inc. v. Courtney,* 09–0508, p. 10 (La.App. 1 Cir. 8/10/10), 47 So.3d 500, 508 (where a breach of contract for right of way on land was at issue, bad faith consisted of "designed breach of ... [a contract] from some motive of interest or ill will"); *MKR Services, L.L.C. v. Dean Hart Constr., L.L.C.,* 44,456, p. 7 (La.App. 2 Cir. 7/8/09), 16 So.3d 562, 566 (where a breach of contract for construction of an apartment complex was at issue, "The term bad faith means more than mere bad judgment or negligence, it implies the conscious doing of a wrong for dishonest or morally questionable motives."); *Nat'l Building & Contracting Co., Inc., v. Alerion Bank & Trust Co.,* 99–2561, p. 9 (La.App. 4 Cir. 11/8/00), 772 So.2d 938, 943 (where a construction loan agreement was at issue, obligors in bad faith owed "all damages foreseeable or

11

not that were a direct consequence of their failure to perform under the agreements with NBC"); *Galloway v. Tenneco Oil Co.,* 313 So.2d 317, 321 (La.App. 4th Cir.1975) (where a written option to purchase land was at issue, "if the debtor is not in bad faith the creditor is entitled [only] to loss of profits that were contemplated or foreseen by the parties at the time of the agreement.").

In support of its alleged cause of action against Miller individually for tortious interference with a contract, CP Marine simply makes the conclusory remark that Miller "intentionally caused The Trust to breach that agreement or render its performance impossible without justification." But, once again, CP Marine offers no well-pleaded factual allegation as to how Miller is supposed to have accomplished these feats. Moreover, the only "agreement" CP Marine can be referring to here is the conditional letter of intent, for as has already been established there is no, and never has been, any Lease Agreement reached by these parties. As already stated, Louisiana has not recognized such a cause of action against any party except a corporate officer and then only in a narrowly defined circumstance.

> To succeed on a tortious interference with business relations claim in Louisiana, a plaintiff must "prove by a preponderance of the evidence that defendants improperly influenced others not to deal with the plaintiff" and "were motivated by actual malice" in so doing. *Jeff Mercer, LLC v. State through Dep't of Transp. & Dev.,* 51,371 (La. App. 2 Cir. 6/7/17), 222 So. 3d 1017, 1024. "**It is not enough to allege that a defendant's actions affected the plaintiff's business interests; the plaintiff must allege that the defendant actually prevented the plaintiff from dealing with a third party.**" *Henderson v. Bailey Bark Materials,* 47,946 (La. App. 2 Cir. 4/10/13), 116 So. 3d 30, 37. After plaintiff passes this threshold, he "must also establish that the interference was improper," *Dussouy v. Gulf Coast Inv. Corp.,* 660 F.2d 594, 602 (5th Cir. 1981), "i.e., **not to 'protect legitimate interests**.'" *IberiaBank v. Broussard,* 907 F.3d 826, 841 (5th Cir. 2018) (quoting *Bogues v. La. Energy Consultants, Inc.,* 46,434 (La. App. 2 Cir. 8/10/11), 71 So. 3d 1128, 1134). **Finally, a plaintiff must prove that the defendant was motivated by spite or ill will to satisfy the malice element.** *Jeff Mercer, LLC,* 222 So. 3d at 1025; *Bogues,* 71 So. 3d at 1135.

> Louisiana's law "is a significant deviation from the common law version of this tort, which requires intentional and improper

conduct, but not a showing of ill will or actual malice." George Denegre, Jr. et al., *Tortious Interference and Unfair Trade Claims: Louisiana's Elusive Remedies for Business Interference*, 45 LOY. L. REV. 395, 403 (1999); *see also Junior Money Bags, Ltd. v. Segal*, 970 F.2d 1, 10 (5th Cir. 1992) ("This [Louisiana] tort does not appear to be as broad as it is under the Restatement or as [plaintiff] urges."); 8 LA. CIV. L. TREATISE, BUSINESS ORGANIZATIONS § 33:12 ("For many years, Louisiana was the only state in the country that refused to recognize any form of tortious interference with contract."). To even survive summary judgment on this action, the plaintiff "**must come forward with evidence of ill will.**" Denegre, *supra*, at 404.

> **Louisiana "jurisprudence has viewed this cause of action with disfavor.**" *Bogues*, 71 So. 3d at 1135. **Courts have explained that satisfying "the malice element ... is difficult (if not impossible) to prove in most commercial cases in which conduct is driven by the profit motive, not by bad feelings.**" *Id.* (quoting *JCD Mktg. Co. v. Bass Hotels and Resorts, Inc.*, 2001-1096 (La. App. 4 Cir. 3/6/02), 812 So. 2d 834, 841). Indeed, SMI concedes that there appear to be no reported cases where a party has been held liable for this tort. *See id.* (quoting *JCD Mktg.*, 812 So. 2d at 841).

> . . . .

> To succeed on its claim, SMI must prove that Whitney improperly, and motivated by "spite or ill will," not negligence, influenced third parties—SMI customers—not to deal with SMI. On this record, SMI's claim must fail.

*Whitney Bank v. SMI Companies Glob., Inc.,* 949 F.3d 196, 207–08 (5th Cir. 2020) (emphasis added).

Thus, even if the cause of action for tortious interference did exist for a trustee such as Miller, and we have already said it does not, CP Marine's petition fails to set forth any factual allegations showing how or when or in what manner Miller engaged in improperly influencing The Trust beneficiaries or his Co-Trustee not to deal with CP Marine, much less any allegations that Miller acted with actual malice when representing the counteroffers/demands of The Trust while negotiating the terms of the Lease Agreement.

For the reasons stated, we reverse the trial court's denial of Defendants' exceptions. We hereby grant and make peremptory the Trustees' Exception of No

Cause of Action, Clarence Miller, Jr.'s Exceptions of No Cause of Action and No Right of Action, and dismiss the action. All costs in this court and in the court below are assessed against CP Marine Offloading, LLC.

**WRIT GRANTED AND MADE PEREMPTORY**.